**WESTINGHOUSE ELECTRIC CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 17004.**

United States Court of Appeals, Seventh Circuit.

April 28, 1970.

Owen Fairweather, R. Theodore Clark, Jr., Chicago, Ill., for petitioner; David L. Trezise, Pittsburgh, Pa., of counsel.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Solomon I. Hirsh, Gary Green, David C. Nevins, Attys., National Labor Relations Bd., Washington, D. C., for respondent.

Before FAIRCHILD and CUMMINGS, Circuit Judges, and CAMPBELL,[1] Senior District Judge.

FAIRCHILD, Circuit Judge.

These cross petitions for review and enforcement of an NLRB bargaining order test the board's designation of a bargaining unit and resulting certification. The principal issue is whether employees included in the unit are statutory supervisors. Refusal to bargain with the certified representative is undisputed, but a secondary issue is whether the employer made a sufficient showing of changed circumstances with respect to supervisory duties so that it was improper for the board to enter summary judgment on the unfair labor practice charge of refusal to bargain.

The employer, Westinghouse, manufactures and services turbine generators and related equipment. The company's steam service department is responsible for installation and subsequent servicing. In this case we are concerned with the steam service engineers attached to two district offices with headquarters in Chicago. The districts are two out of five in the central area, one of the company's five areas in the United States.

There were at the time of the representation hearings approximately twenty field engineers attached to the Chicago offices. Clearly outside the unit, but attached to these offices, are two clerical employees and five supervisory employees. The latter five are the Central Area Steam Service Manager, the Midwest and Chicago District Steam Service Managers, and two senior service assistants.

The field engineers here involved are salaried (receiving extra pay for overtime) and skilled in mechanical engineering, most having a mechanical engineering bachelor's degree and the rest having become skilled through on-the-job experience. They are ranked "A," "B," or "C" depending on their ability. About 95% of their time is spent outside the office installing or servicing steam turbine equipment at customer locations. The jobs they work on vary in size from large installation projects taking over a year to complete and requiring 5 or 6 engineers and an additional work force of as many as 35 craftsmen, down to servicing jobs consuming a few hours and requiring only one or two engineers. Any of the field engineers may be selected as the "lead engineer" who will have overall responsibility for a given project. An "assistant engineer" is responsible for only a certain phase of the work, or for only one shift on large projects where work is done on more than one shift. Assignments to such positions depend on the complexity of the job and the ability and availability of the particular engineers. Six out of the total number of field engineers are more often selected as lead engineers for larger projects. Occasionally engineers from outside the Chicago area are called in as lead engineers on particularly complicated projects.

Westinghouse uses two basic approaches in both installation and servicing work: (1) the "technical supervi-

---

1. Senior District Judge Campbell of the Northern District of Illinois is sitting by designation.

sion" method and (2) the "labor contract" method. Under a "technical supervision" arrangement, Westinghouse supplies material and equipment at specified prices and the services of one or more engineers at an hourly rate, while the customer supplies the "casual labor" and any foremen or, on large projects, superintendents. On a labor contract project Westinghouse agrees, for a total fee, to perform a complete installation or service, supplying the materials, engineering service, and additional labor necessary to fulfil its contract. The craftsmen, sometimes referred to as casual labor, are hired by Westinghouse from local unions or through a labor broker. The evidence indicates that a labor contract project is ordinarily longer and more complicated than a technical supervision job.

The original petition for an election was filed December 7, 1964. On February 12, 1965, after a hearing, the regional director ordered an election in a unit found appropriate and defined as follows:

"All professional Steam Service field engineers employed at the Employer's Chicago, Illinois district offices; excluding all service assistants, office clerical employees, guards, supervisors as defined in the Act, and all other employees."

Westinghouse sought review, and the board remanded for further hearing on the question whether the field engineers are supervisors. Hearings were held in April, 1965. On March 31, 1967, the board issued its decision on review, reported at 163 NLRB 96.

The gist of the board's decision was that except for special responsibilities imposed only on lead engineers assigned to labor contract projects, the field engineers are professional employees and the guidance or direction they give to the workmen on the project is not supervision in the statutory sense. The board found that the lead engineer on a labor contract project has special duties vis-a-vis the draftsmen employed by Westinghouse and by reason of these duties a field engineer, while engaged as a lead engineer, has supervisory status in the statutory sense. The board rejected the Westinghouse claim that every field engineer who performed such supervisory work for some part of the year should be excluded from the unit. Relying upon its own *Great Western Sugar Company*[2] decision the board decided to include in the unit and qualify as a voter each engineer who, during the preceding year, spent 50% or more of his working time (excluding leave or waiting time) performing nonsupervisory duties. The board specified, however, that any bargaining representative may not represent any engineer with respect to his supervisory duties.

The election was held May 26, 1967, with 17 eligible employees voting. On a vote of 9–8, the regional director certified the Federation of Westinghouse Independent Salaried Unions as the bargaining representative of the unit.

In the unfair labor practice proceeding which followed refusal to bargain, Westinghouse opposed summary judgment and submitted an affidavit allegedly showing changed circumstances. The board granted summary judgment[3] and issued a bargaining order.

Westinghouse contends that the following relationships are supervisory in the statutory sense: (1) the lead engineer's relationship with so-called casual labor on contract projects; (2) the lead and every other field engineer's relationship with the customer's employees on technical supervision projects; (3) the lead engineer's relationship with other field engineers on either type of project; (4) the other field engineers' relationship with casual labor on contract projects; and (5) the field engineers' relationship with bladers and generator mechanics, both Westinghouse employees, assigned to contract and technical supervision projects. Westinghouse further (6) challenges the board's concept that

at any particular time a field engineer who is or has been assigned to a supervisory job is not deemed a supervisor for purposes of membership and eligibility to vote in a unit if 50% or more of his time during the preceding year has been spent on assignments where he was not a supervisor. Westinghouse also contends (7) that all the field engineers are managerial employees, whether or not they are supervisors.

The board agreed as to Westinghouse contention (1). (Relationship of lead engineers with casual labor on contract projects.) It found that lead engineers on contract projects perform special administrative duties, such as purchasing certain supplies, arranging through unions or labor brokers for employment of craftsmen and foremen, establishing payroll and accounting systems, paying project bills, and arranging in some instances to subcontract portions of the work. Although the board considered the duties of lead engineers on these projects primarily professional, as it considered the duties of all other field engineers, the board noted that the foremen directly supervising the craftsmen would seek approval of certain decisions by the lead engineers before making their own decisions final, and that union stewards have presented grievances to lead engineers and accepted their decisions. The board considered the relationship to be supervisory in character.

The Westinghouse contentions other than (1) present the issues now before us.

(2) *Relationship of every field engineer with the customer's employees.*

■■ We have no difficulty sustaining the board's decision on this issue. The board concluded that the field engineers, lead or otherwise, on technical supervision projects, give technical advice and instructions to the customer's foreman, who is the real supervisor of the customer's other employees. Beyond that, however, the fact that the people allegedly supervised are not Westing-

house employees prevent the field engineers from being their supervisors within the meaning of section 2(11) of the act, 29 U.S.C. § 152(11).[4]

■ Westinghouse argues that the customer "shares" these employees with Westinghouse. We think, however, that the board properly viewed the arrangement as one by which Westinghouse provides technical direction and guidance to the customer's employees in order that the customer may achieve its own objective through the effort of its employees, supervised, in the statutory sense, by the customer.

(3) *Relationship of the lead engineer to other field engineers assigned to the same project.*

■■ There is ample support for the board's view. The engineers are professional employees. Any may be selected as the lead engineer for a project, although such assignments on the larger projects tend to be made to one of six. The lead engineer has overall responsibility for the planning, scheduling, and successful completion of the work. Other field engineers are normally assigned, each to a particular phase of the work (such as piping, electrical controls, or mechanical work) or, where work is done on more than one shift, to a particular shift.

Except for the fact that the lead engineer is given wider authority and greater responsibility as to the particular project, there is no evidence that he exercises or has the type or degree of authority over the other engineers which would make him their supervisor in the statutory sense. As will be later noted, the board is not bound by testimony that the lead engineers "give directions" or "give instructions" to the others.

(4) *Relationship of the other field engineers to casual labor on contract projects.*

The field engineers have specialized technical competence. They plan, lay out, and prepare detailed schedules for

---

4. Illinois State Journal-Register, Inc. v. N.L.R.B. (7th Cir., 1969), 412 F.2d 37, 43.

**1156**

the steps to be performed in the particular operation or phase to which they are assigned. They are markedly different from foremen in the commonly recognized sense. They surely give directions as well as advice, but such communications are necessary incidents of the application of their technical know-how. The record before us is opaque, and a picture of the activities of the field engineers which would be significant as to the degree and manner in which they direct (and may possibly be said to supervise) others does not come through with clarity.

We think that in testing whether the board's finding is adequately supported, it must be said that the technical character of the work of the field engineers, together with the varying nature and duration of their assignments, and the other circumstances, is sufficient substantial evidence to support the board's finding unless there is evidence which virtually compels a contrary finding. It seems reasonable that the employer bear responsibility for deficiency or vagueness in this area of proof.

There is much testimony in the record indicating that in any of the relationships under consideration there is supervision in some sense. Witnesses often used some form of the verbs "instruct," "direct," and "supervise," or, on the other hand, "work under." There is enough play in the meaning of those terms that the board is not bound to equate them with supervision in the statutory sense.[5]

"Although there are many ways in which one person can 'direct' and 'assign' another, only if the individual 'directs' or 'assigns' *qua* employer, or *qua* representative of the employer, such as a foreman might do, does the individual 'supervise' within the meaning of Section 2(11)."[6]

■ Sec. 2(11) provides:

"(11) The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

The determination of who is a supervisor "is a practical matter and one of fact in which the Board, in the exercise of its primary function as fact finder, must be permitted 'a large measure of informed discretion.' "[7] As stated by the second circuit,

"Inasmuch as infinite variations and gradations of authority can exist within any one industrial complex and any drawing of the line between the personnel of management and the rank and file workers may require some expertise in evaluating actual power distributions which exist within an enterprise, the Board's findings relative thereto are entitled to great weight." [8]

There is testimony (which makes this (4) a close question) that on labor contract projects a phase engineer has recommended, for final decision by the lead

---

5. Employees have been held not to be supervisors where they had specialized technical competence and gave detailed instructions to less knowledgeable employees in order that the latter may effectively perform the needed work. N.L.R.B. v. American Oil Company (7th Cir., 1967), 382 F.2d 786, cert. den. 391 U.S. 906, 88 S.Ct. 1656, 20 L.Ed.2d 420.

6. International Ladies' Garment Workers' Union, A.F.L.–C.I.D. v. N.L.R.B. (2d Cir., 1964), 339 F.2d 116, 121.

7. N.L.R.B. v. Henry Colder Co. (7th Cir., 1969), 416 F.2d 750, 754; N.L.R.B. v. Process Corp. (7th Cir., 1969), 412 F.2d 215, 218. See also N.L.R.B. v. Security Guard Services, Inc. (5th Cir., 1967), 384 F.2d 143, 146.

8. N.L.R.B. v. Metropolitan Life Ins. Co. (2d Cir., 1968), 405 F.2d 1169, 1172. See also Marine Engineers Beneficial Association v. Interlakes SS Co. (1962), 370 U.S. 173, 179, 82 S.Ct. 1237, 8 L.Ed.2d 418, n. 6.

engineer, increasing or reducing the number of craftsmen working on his phase; that a phase engineer would report incompetency of a craftsman to the lead engineer and the latter would accept his word; that the phase engineer recommends to the lead engineer the authorizing of overtime and has authority to decide which individual will work overtime; that there have been instances where a phase engineer has recommended discharge of casual laborers, and the lead engineer has carried it out, and where phase engineers have transferred casual labor between them.

▆ These instances do suggest supervisory status, although the record does not clearly establish a uniform pattern. It also appears that there are usually foremen on the job, and that the field engineer gives his directions to the foreman rather than directly to the man who is to perform the task. Our reading of the somewhat unsatisfactory record does not lead us to the conclusion that the testimony above summarized compels a finding that the phase engineers are supervisors of the craftsmen in the statutory sense.

(5) *Relationship of field engineers to bladers and generator mechanics.*

▆ The testimony shows that blading is a specialized type of work on turbines, although the details are not described. Until about the time of the 1965 hearings, two bladers had been attached to the Chicago office. A change was being made so that all bladers would be based in Philadelphia. Nothing was said at the hearings about supervision of bladers in the past nor under the new plan.

After the general counsel moved for summary judgment in the unfair labor practice proceeding, Westinghouse opposed the motion. It showed by affidavit that 7 bladers and 9 generator mechanics, based in Philadelphia, are assigned to both labor contract and technical supervision jobs, as required. There is nothing to indicate how frequently any of these men work on jobs in the districts involved here. Presumably they fill the needs for their type of work throughout the country, if not a wider market. It was asserted that when they are assigned, they "work under the immediate supervision of a field service engineer who determines their hours, signs their time sheets, assigns their work and evaluates their performance for such purposes as promotion and pay increases." Whether this differs from the relationship between the field engineers and the two bladers before the 1965 hearing does not appear. It would seem that if this relationship were really significant, Westinghouse would have presented evidence on it in 1965.

The Westinghouse letter of June 19, 1967 to the union, refusing to bargain unless so directed after court review, asserted that the board had erred, but did not suggest there had been a change in circumstances. Its answer in the unfair labor practice proceeding did not allege any change.

We conclude that the assertion made concerning bladers and generator mechanics in opposing summary judgment did not entitle Westinghouse to relitigate the status of the field engineers in the unfair labor practice proceeding.

(6) *The board's 50% formula.*

The board considered whether every field engineer who had worked as a lead engineer on a labor contract job at any time during the year covered by the record must be excluded from the unit as a supervisor. It noted that among six such engineers the percentage of time spent by each varied from 15% to 95%. Three spent more than half and three less. The board concluded that the latter "are primarily attached to the non-supervisory work force and that they share a substantial community of interest with their fellow non-supervisory engineers in the conditions governing the performance of unit work." It noted that when any engineer is a lead engineer on a labor contract project, his supervisory authority does not extend to other engineers. The board resolved the issue by prescribing the 50% formula,

but also stipulating that any bargaining representative may not represent any engineer with respect to his supervisory duties.

 The act gives the employer a right to have employees who are really supervisors excluded from bargaining units. But the board has a duty to employees to be alert not to construe supervisory status too broadly because the employee who is deemed a supervisor is denied employee rights which the act is intended to protect.

Westinghouse points out that, under the board's formula, at any given moment a field engineer who is on an assignment where he has supervisory duties is nevertheless a member of the unit, and eligible to vote, if more than half his working time in the last 12 months has been spent on assignments where he did not have that authority. On the other hand, as happened in one instance at the time of the election in this case, a field engineer who is, at a given moment, assigned to a job where he does not have supervisory duties is not a member and not eligible to vote if he has spent a bare half of his working time in the last 12 months on assignments where he did have such duties.

 Obviously the situation of the field engineer who is sometimes assigned to a job where he has supervisory authority and sometimes to jobs where he does not is ambiguous, and there can be no perfect, all-weather, answer. We think that the board's formula in the peculiar circumstances here reasonably

protects the legitimate interests of the employer and employees.

(7) *Alleged managerial status of field engineers.*

 Although the act contains no exemption for "managerial" employees, they have long been excluded from coverage as a matter of board policy.[9] As is set forth in Illinois State Journal-Register, Inc. v. N. L. R. B.,[10] the fundamental tests to be used in determining whether an individual is such a "managerial" employee are: (1) whether the employee is "so closely related to or aligned with management as to place the employee in a position of potential conflict of interest between his employer on the one hand and his fellow workers on the other" and (2) "whether the employee is formulating, determining and effectuating his employer's policies or has discretion, independent of an employer's established policy, in the performance of his duties."[11] While the engineers here exercise a certain amount of independent technical judgment, it is the district or area managers who effectively set and carry out management policy. Only minor on-the-job changes from the original plans are permitted without approval from headquarters. The lead engineers' authority to pledge the company's credit is limited to relatively small and routine purchases. We find substantial evidence on the record as a whole to support the board's finding that the responsibilities of the engineers are not managerial.[12]

The order of the board will be enforced.

---

9. See Ford Motor Co., 66 NLRB 1317 (1946).

10. *Supra*, n. 4.

11. *Id.* at 41.

12. See International Ladies' Garment Workers' Union, A.F.L.–C.I.O. v. NLRB,

339 F.2d 116, 123–124 (2d Cir., 1964); Puget Sound Power & Light Co., 117 NLRB 1825, 1827 (1957); Westinghouse Electric Corp., 92 NLRB 871 (1950); and Palace Laundry Dry Cleaning Corp., 75 NLRB 320 (1947).