**MEREDITH CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

and

**American Federation of Television and Radio Artists, Kansas City/Omaha Local, Intervenor.**

No. 79–2086.

United States Court of Appeals, Tenth Circuit.

June 1, 1982.

---

**1334**

Bruce R. Alper, Chicago, Ill. (John P. Jacoby, and Vedder, Price, Kaufman & Kammaholz, Chicago, Ill., of counsel, were also on the brief), for petitioner.

Jerrold J. Wohlgemuth, Washington, D. C. (Andrew F. Tranovich, William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., were on the brief), for respondent and cross-petitioner.

C. David Whipple, Kansas City, Mo. (Julie Lynn Fry of Whipple, Eisler & Kraft, Kansas City, Mo., was also on the brief), for intervenor.

Before SETH, Chief Judge, and HOLLOWAY and SEYMOUR, Circuit Judges.

HOLLOWAY, Circuit Judge.

Meredith Corporation petitions for review of a decision and order of the National Labor Relations Board (NLRB or the Board) finding that Meredith engaged in unfair labor practices by refusing to bargain with the American Federation of Television and Radio Artists (the Union). The Board filed a cross-application for enforcement of its order and the Union was permitted to intervene. The sole issue is whether the Regional Director erred in finding that Meredith's television directors and production assistants are not supervisors within the meaning of the National Labor Relations Act (the Act).

I

In September 1978 the Union filed a petition with the Board seeking an election among Meredith's directors and production assistants to determine whether such employees desired to be included in the existing bargaining unit of on-air radio and television performers already represented by the Union. Meredith opposed the Union's demand, contending that the directors and production assistants were supervisors within the meaning of § 2(11) of the Act, 29 U.S.C.A. § 152(11), and therefore not includible in the requested unit. Following a hearing on October 19 and 20 before a hearing officer of the Board, the Board's acting Regional Director, hereafter referred to as the Regional Director, on November 9 issued his decision finding that the directors and production assistants were not supervisors and directing that an election be held. Meredith's request that the Board review the Regional Director's decision was denied.

On December 5, 1978, the Board conducted a representation election, which the Un-

ion won. On December 13 the Board certified the Union as the exclusive bargaining representative for the directors and production assistants and included them within the pre-existing unit already represented by the Union.

On or about January 8, 1979, and continuing thereafter the Union requested that Meredith bargain collectively with respect to the terms and conditions of employment of the directors and production assistants. Meredith refused to bargain on the ground that the Board's decision holding that the directors and production assistants were not supervisors was erroneous as a matter of fact and law.

On February 15 the Regional Director issued a complaint alleging that Meredith has engaged in unfair labor practices within the meaning of § 8(a)(5) and (1) of the Act, 29 U.S.C.A. § 158(a)(5) and (1), by refusing to bargain collectively with the Union. After Meredith answered, the Regional Director moved to transfer the proceeding to the Board and for summary judgment. The proceeding was transferred to the Board and the summary judgment was granted on July 9, 1979.

In its decision and order, 243 N.L.R.B. 323, the Board stated that Meredith was attempting in the unfair labor practice proceeding to raise issues which were specifically considered and resolved in the prior representation proceeding. The Board held that Meredith was not entitled to relitigate these issues and that summary judgment against the company was appropriate. Meredith petitioned for review and the Board made a cross-application for enforcement. The major contention by Meredith is that the directors and production assistants do "responsibly direct" other employees so as to be supervisors within the meaning of § 2(11) of the Act, which the Board denies.

## II

■ Section 2(11), 29 U.S.C. § 152(11), defines supervisor as

... any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

Since this section is framed in the disjunctive, the existence of any one of the listed powers, as long as it involves the use of independent judgment, is sufficient to support a determination of supervisory status. *N.L.R.B. v. Dillon Stores,* 643 F.2d 687, 691 (10th Cir.).

■ The issue as to whether the directors and production assistants are supervisors was raised before the Regional Director and may be reviewed here. *See Pittsburgh Plate Glass Co. v. N.L.R.B.,* 313 U.S. 146, 154, 61 S.Ct. 908, 913, 85 L.Ed. 1251; *Bokum Resources Corp. v. N.L.R.B.,* 655 F.2d 1021, 1023–24 (10th Cir.). Thus the issue before us is whether there is substantial evidence in the record as a whole to support the Regional Director's finding that directors and production assistants are not supervisors, but employees entitled to the protection of the Act. *Universal Camera Corp. v. N.L.R.B.,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456; *N.L.R.B. v. Corral Sportswear Co.,* 383 F.2d 961, 964 (10th Cir.), *cert. denied,* 390 U.S. 995, 88 S.Ct. 1196, 20 L.Ed.2d 94. Since the determination involves the specific application of a broad statutory term by the agency administering the statute, the finding will be given appropriate weight; the agency must be permitted a large measure of informed discretion. *See Marine Engineers Beneficial Assoc. v. Interlake Steamship Co.,* 370 U.S. 173, 179 n.6, 82 S.Ct. 1237, 1240 n.6, 8 L.Ed.2d 418; *Corral Sportswear,* 383 F.2d at 963; *Furr's Inc. v. N.L.R.B.,* 381 F.2d 562, 565 (10th Cir.), *cert. denied,* 389 U.S. 840, 88 S.Ct. 70, 19 L.Ed.2d 105; *cf., Charles*

*D. Bonanno Linen Service, Inc. v. N.L.R.B.,* —— U.S. ——, ——, 102 S.Ct. 720, 723, 70 L.Ed.2d 656. The findings of the Regional Director, if not set aside by the Board, are, of course, entitled to the same weight as those of the Board. *Bokum Resources,* 655 F.2d at 1023.

### III

### A.

### *The general background of Meredith's operations*

Meredith operates two radio stations and a television station in Fairway, Kansas. The five directors and five production assistants, whose supervisory status is at issue, work in the television operation which includes a commercial video operation. The television station is under the overall operation of the general manager and is divided into a number of separate departments including the engineering department and the production department. The engineering department is headed by the chief engineer and contains many of the employees who operate technical equipment.[1]

The directors and production assistants in question work in the production department, which is headed by the program manager. Directly under the program manager in the production department are the production manager and the assistant production manager. The directors and production assistants work under and directly report to all three persons—the program manager, the production manager and the assistant production manager. The only other members of the production department are five stagehands. The parties have stipulated that the general manager, the program manager, the production manager and the assistant production manager are supervisors within the meaning of the Act.

As noted, there are five directors whose status is at issue. One directs the weekday newscasts, two direct commercial productions, and two direct the weekend newscasts and assist with the weekday newscasts and commercial production. The particular duties and responsibilities of the directors vary to some degree, depending on whether they are directing newscasts or commercial productions, but there are also some functions concerning personnel matters that are common to all of the directors. We will first discuss the distinct duties and responsibilities of the commercial and newscast directors and then their common functions concerning personnel matters. After the latter discussion we will describe the duties and responsibilities of the production assistants.

We will first survey briefly the legal test of the power "responsibly to direct" other employees within the meaning of § 2(11).

### B.

### *The test as to the power "responsibly to direct"*

The § 2(11) power which Meredith argues is possessed by the individuals in question is the power "responsibly to direct" other employees. Thus the issue before us is whether the directors and production assistants responsibly directed other employees, and in that connection, whether they exercised independent judgment.

Responsibility is defined as being " 'answerable for the discharge of a duty or obligation. Responsibility includes judgment, skill, ability, capacity and is implied by power.' " *Monongahela Power Co. v. N.L.R.B.,* 657 F.2d 608, 613 (4th Cir.), *quoting from Ohio Power Co. v. N.L.R.B.,* 176 F.2d 385, 387 (6th Cir.), *cert. denied,* 338 U.S. 899, 70 S.Ct. 249, 94 L.Ed. 553. It is not, however, responsibility per se or the

---

1. While most employees who operate technical equipment are in the engineering department, the production assistants who operate the chy-

ron character generator work in the production department.

exercise of independent judgment or discretion which identify a supervisor; the responsibility for directing other employees is the critical factor. *Exxon Pipeline Co. v. N.L.R.B.*, 596 F.2d 704, 705 (5th Cir.). Moreover, in directing other employees, a person is a supervisor only if he directs *qua* employer or *qua* representative of the employer, such as a foreman might do. *Westinghouse Elec. Corp. N.L.R.B.*, 424 F.2d 1151, 1156 (7th Cir.), *cert. denied*, 400 U.S. 831, 91 S.Ct. 63, 27 L.Ed.2d 62. We believe the test is clearly stated in *Goldies, Inc. v. N.L.R.B.*, 628 F.2d 706, 709 (1st Cir.):

"The test must be the significance of his judgments and directions." [citation omitted]. This sounding is to be taken with respect to the fundamental twin principles that a supervisor represents the interests of his employer vis-a-vis other employees and is not "one of the gang who merely gives routine instructions."

### C.

### *The directors' functions in commercial productions*

We turn first to the question whether the directors' functions in commercial productions reveal the power "responsibly to direct."

When working on a commercial production, the director is assigned to a specific project by the production manager or assistant production manager, who also book these projects. Each production crew contains some individuals from the production department and the engineering department. Those from the production department are assigned by the production manager or assistant production manager. The chief engineer assigns the technicians from engineering. The director can request certain individuals for the project. The requests are usually honored by the production department, but not by engineering.

The director contacts the client or the advertising agency to make any necessary pre-production plans. At least 95% of the commercials are done through an ad agency, which not only provides a producer who is not a Meredith employee but also prepares a script in advance. The script sets forth the format and content for the particular commercial. On some occasions the agency will also supply the director with a storyboard that visually explains the script. The storyboard contains actual drawings of how each frame of the commercial should look. In the cases where the customer does not go through an advertising agency, a station salesman provides the director with a script and acts as the producer.

During actual filming of the commercial the director gives other members of the stage crew instructions. For example, he gives instructions concerning camera angle, lighting, the actor's dress and makeup. The director, however, does not personally know how to operate all of the equipment used by the technicians. The director produces the commercial within the parameters of the script and storyboard and must ultimately meet the producer's specifications and satisfaction. The director at times does suggest to the producer ways to improve the commercial product, but the authority to make changes lies solely with the producer. During taping of the commercial the director is primarily responsible for coordinating the efforts of the various production crew members to reach the result desired by the producer.

The final responsibility of the program's content, however, does not rest with the director, but the producer. The producer is present throughout the session, (III R. 86), and is constantly giving advice on what he likes and doesn't like. Final responsibility and approval is with the producer. (III R. 88–99, 171).

Beyond the issue of the power to determine the commercial's content, there was evidence concerning the authority of the director to determine the work schedule of the production crew. The production manager, Carl Chance, testified that at the com-

pletion of a session the director "usually . . . tells the crew the session is over, releases the crew." (III R. 21). He also stated that the director is the person who determines whether a production session will extend past normal working hours. According to Mr. Chance, a director does not have to get his approval to have the crew members from the production department work overtime, but crew members from the engineering department must obtain approval from their supervisor. When an overtime situation arises, a director on some occasions will notify Mr. Chance or his assistant, but at other times he won't—prior approval according to Mr. Chance is not required. (III R. 21–23; 192–93; 200–03).

The production manager testified similarly with respect to the decision to begin a production session prior to normal business hours. He stated that a director may determine, after talking with the agency producer, that a session may need to start early. In most instances the director will notify the production manager or his assistant of the change because the engineering department will have to be notified so they can adjust their schedules. Mr. Chance again stated that he did not require the director to obtain advance approval of the change. (III R. 192, 200). Mr. Chance also noted while it was preferable for him to personally notify the head of the engineering department to arrange a schedule change, less formal means of notification were acceptable. (III R. 200–201).

Thus there was testimony from the production manager, Mr. Chance, that the directors had authority to determine the work schedules of the commercial production crew. There was, however, testimony from one director denying this authority. Lanny

Ross testified that the agency producer makes the decision to extend the session past normal working hours; that the producer decides whether he is willing to pay the Meredith people for staying over. Mr. Ross then stated that if the producer decided to extend the session, the director would contact the production manager or his assistant and tell them the session would be extended. A member of the engineering crew, the production manager or the assistant production manager would then notify the chief engineer or his assistant. Mr. Ross also stated that he would inform his "production crew" that we are staying late, and that the "engineering crew" would get notification from their supervisors. (III R. 108–09).[2]

Mr. Ross gave similar testimony concerning the decision to cancel a session caused by some part of the production process not being ready on schedule. While Ross characterized the decision to cancel as a "dual decision" by the producer and the director, his subsequent testimony indicated that authority was actually held by the producer. (III R. 113–14).

In resolving the conflict between the testimony of Ross and Chance, the Regional Director apparently[3] placed more reliance on the testimony of the director Ross. In his findings the Regional Director stated (I R. 332):

> In the event production extends past normal working hours, the decision to do so rests with the client.

For reasons discussed in Part IV, *infra*, we conclude that, under the proper test, the evidence as a whole concerning the directors' functions in commercial productions supports the conclusion that the directors do not "responsibly direct" other employees.

**2.** Mr. Ross's reference to the "production crew" is apparently a reference only to production assistants and stagehands. (III R. 109).

**3.** In his findings the Regional Director uses the terms "producer" and "client" as if they were separate persons. The latter is apparently a reference to the business or individual who is the subject of the commercial and is ultimately

paying for its production. The record does not support the finding that the "client", as thus defined, made the decision to extend the session past normal working hours. Thus we are convinced that the Regional Director used "client" in the finding quoted above to refer to the agency producer.

### D.

*The directors' functions in newscast productions*

■ The responsibilities of the news directors are similar to those of the commercial directors. Overall responsibility for organizing and producing newscasts rests with the news producer, who, unlike the commercial producer, is a Meredith employee. The director's duty is to see that the show goes off smoothly.

When the news director first arrives at the station he obtains a copy of a log listing all the programming and commercial material to be broadcast that day. Based on the log he prepares a commercial format and distributes copies to people that need to have it. The director then gets several copies of the show format from the news producer. This format contains specific instructions as to the order in which the news stories will be presented, the amount of time allocated to each story, and the anchor-person who will present the various videotapes or special features used to accompany each story.

The director makes markings on the show format in a process called "blocking." These markings describe which cameras and angles to use, when to insert graphic displays, and whether a specific microphone is needed. The director also obtains a copy of the script, which is prepared by the on-air performers, and discusses with them any special needs or problems that they may have with the broadcast. He also talks with the videotape editors to see if they have the correct tapes and if the equipment is working properly. At this time the director gives a copy of the show format and a copy of the tape list, to the videotape operator.

During actual production of the newscast the news director sits in the control room and wears a headset through which he is able to communicate with all crew members. The control room contains several video monitors which display all the video sources that might be used including slides, videotapes, and cameras. The director gives verbal instructions to crew members as to what type of picture, sound or videotape will be needed for the upcoming news story.

The producer sits next to the director in the control room. The producer is concerned with the timing of each story and is responsible for making decisions from the control room regarding the order of the stories presented. (III R. 49). Moreover, in the event of late-breaking news mandating a change in the content of the newscast, the producer makes the necessary decision. The responsibility to change the content of the newscast lies with the producer. Although the director may suggest an appropriate spot to place the late-breaking story, the decision is made by the producer. (III R. 68). Thus the director does not have authority over the content of the show, but is responsible for the visual quality or artistic balance of the show. (III R. 41, 70). In this connection he gives instructions to the technicians and on-air performers, but the producer is the person in charge. (III R. 165).

Again, under the authorities discussed in Part IV, *infra*, we feel the record supports the conclusion that the functions of the directors in newscasts do not demonstrate that they "responsibly direct" other employees.

### E.

*The directors' functions concerning personnel actions*

None of the directors attend management meetings. (III R. 96). They do not have the authority to handle grievances of other employees, nor do they hire, fire, discipline, transfer, promote, demote, assign or lay-off any of the other production crew employees they work with. The decision to take these actions lies solely within the control of the production manager or the assistant production manager. (III R. 55–57, 96–99, 173, 218–19; *see id.* at 75).

■ The Regional Director also found that the directors did not effectively recommend such actions. (I R. 332). While there is some conflict in the testimony, this finding is supported by substantial evidence. Two of the directors who testified were asked to explain what action they took when a member of the crew was not properly performing his duties. Each testified that he complained about the problem, but that very little had been done as a result of his complaint to correct the problem.[4] One of the directors testified that he had twice complained to chief engineer about problems involving a "technical person." He stated that the complaints had "been recognized but not really acted upon." (III R. 57; see III R. 56–57, 97–98).

Carl Chance, the production manager, testified that directors had the responsibility to inform the production office of problems concerning equipment or personnel, and that they had written memos containing this type of information. (III R. 212; see II R. 299–300). Chance stated that after obtaining the information and gaining an understanding of the problem, he would contact the department in which the problem existed to effect a change. (III R. 214). Chance testified that the engineering department was out of his realm, and that he had to go through department heads in requesting a change. (III R. 218–19).

Chance also related one instance where a cameraman was removed based upon complaints received from directors. Chance asserted that the input from the directors had caused the removal, but acknowledged that complaints had also come from an assistant production manager, which is a management and supervisory position. Chance had also received complaints from an advertising agency customer and from stagehands. (III R. 214–220, 238–245).

We conclude that there was substantial evidence supporting the Regional Director's finding that directors do not effectively recommend personnel actions such as firing, disciplining or demoting. While there was evidence that the directors had the responsibility to bring problems to the attention of the production manager, the Regional Director could reasonably find that these complaints did not effectively result in actions to correct the problem. The record only contains evidence as to one occasion when directors had complained about an employee who was subsequently dismissed. In this instance, however, the production manager had received complaints from others including an assistant production manager who was a member of management, an advertising agency, and several stagehands. Moreover, the authority to dismiss the cameraman was held by the engineering department, which was not under the control of the production manager, much less the control of the directors.

Under the authorities discussed in Part IV, *infra*, we feel the record supports the conclusion that the functions of the directors concerning personnel matters do not demonstrate that they effectively recommend personnel actions or "responsibly direct" other employees.

### F.

### *The production assistants' functions in commercial and newscast productions*

■ Production assistants perform various functions, one of which is to "floor direct" commercial sessions and newscasts. The floor director acts as an extension of the director, who is in the control room. Thus the floor director is in charge of the actual movements on the studio floor. He indicates what camera is on, determines whether the microphones are working and in the proper location, relates problems that arise on the floor to the control room and vice versa, and gives time cues to the talent.

---

4. On appeal Meredith argues that the testimony given by director Ross indicates, "not that directors' complaints are given short-shrift, but that personnel decisions are implemented through the personnel department, not the production department." (Reply Brief of Petitioner at 4). We cannot agree. Reading Ross's testimony in its entirety, we believe that Ross intended to indicate that his complaints were ineffectual. (See III R. 97–98).

In addition, the production assistants act as director for all night-time production work, and some commercial sessions, newscasts, public service programs and station promotions. When engaged in directing, their basic functions and responsibilities are the same as a full-time director.

Production assistants also perform other functions not involving the direction of other employees. They operate a chyron character generator, a computer which generates letters or graphics which are superimposed on the screen. Other duties include labeling tapes and producing photographic slides. As with full time directors, production assistants do not attend management meetings, schedule their own overtime, handle grievances of other employees, or hire, fire, transfer, promote, demote, lay-off, reward or take disciplinary action against other employees. (III R. 159–60).

For reasons spelled out in Part IV, *infra*, we conclude that the record supports the determination that the production assistants' functions do not show that they "responsibly direct" other employees.

IV

*The validity of the conclusion that the directors and production assistants do not "responsibly direct" other employees*

We feel that Regional Director followed the correct principles in the findings he made. He cited two cases for the proposition that the directors and production assistants were not supervisors. They stand for the proposition that television directors with duties similar to those here do not responsibly direct others because their direction is either routine in nature or motivated by artistic effect, the director's authority being limited by pre-existing production policies or the detailed guidelines of a script. In *Westinghouse Broadcasting Co., Inc. (WBZ–TV)*, 215 N.L.R.B. 123, the issue was whether "producer/directors" were supervisors. These individuals acted as both producers and directors, but when acting as directors their duties were substantially the same as those of the directors in this case. There the Board stated, *id.* at 125–26:

Producer/directors in the present cases do instruct members of a production crew in preparation for and during actual filming of a television show. The instruction given, however, is either routine in nature or motivated by artistic effect. It is clear that the producer/director is limited by preexisting production policies or the detailed guidelines of a script. Under such conditions producer/directors use no independent judgment and serve merely as conduits in issuing orders which crew members, each supplied with a script, already anticipate and are independently capable of achieving. Other directions which describe a desired artistic effect may not contain the precise information necessary for their technical fulfillment. In fact, the producer/directors are not themselves endowed with the technical expertise necessary to execute many of their own directions.

\* \* \* \* \* \*

We conclude from the entire record in these cases that producer/directors function not as supervisors, but as part of an integrated production team, each member of which is independently capable of executing his assignment.

In *Post-Newsweek Station WPLG–TV*, 217 N.L.R.B. 14, the Board again held that producer/directors were not supervisors, stating, *id.* at 14 n.3:

Programming at WPLG is essentially a collaborative effort, and while a producer/director may have considerable input into such effort his role is far short of exclusive control ... The range of authority is circumscribed as in [*Westinghouse (WBZ–TV)*].

The Board's position was explained further in *Westinghouse Broadcasting Co., Inc. (KDKA–TV)*, 216 N.L.R.B. 327, where it stated (*id.* at 329):

The directions given by KDKA directors are routine technical or aesthetically motivated commands made pursuant to preconceived production guidelines which have been approved by higher authorities; the instructions are independently executed by technical personnel already acquainted with the production plan who are endowed with skills not generally native to the director.

Moreover, the Board has denied supervisory status to directors with similar duties in several other cases. *Taft Broadcasting Co.*, 226 N.L.R.B. 540, 542 (1976); *Westinghouse Broadcasting Co., Inc. (WJZ–TV)*, 218 N.L.R.B. 693 (1975); *Golden West Broadcasters*, 215 N.L.R.B. 760, 761–62 (1974); and a Board decision on this issue was upheld by the Second Circuit. *Westinghouse Broadcasting Co., Inc., KYW–TV v. N.L.R.B.*, 503 F.2d 1055 (2d Cir.), *enforcing*, 209 N.L.R.B. 788 (1974); *see generally* Annot., 48 A.L.R. Fed. 45, 87–97.

We find no basis for distinguishing this case from these post-1974 Board cases, which we accept. The authority of Meredith's directors is governed by the producer's control over content. The news director must give instructions in accordance with the show's format, which is prepared by the producer, and changes from the format must be approved by the producer. The directions given by the director relate to the type of picture, sound or videotape to be used for the upcoming story, but the producer is in charge.

The same can be said with respect to the commercial director. He gives directions within the parameters of the script or storyboard given to him by the advertising agency producer. The director is responsible for coordinating the efforts of the various production crew members to reach the result desired by the producer. The evidence as to the director's authority to begin a session before or extend a session after normal business hours is mixed. There was, however, substantial evidence showing that these decisions were made by the producer, not the director. The fact that the producer is not a Meredith employee is not significant because the producer's control over production is clearly in accordance with Meredith company policy.[5]

We feel that the Regional Director could reasonably find that each director was merely "one of the gang who gives routine instructions." *Goldies, Inc. v. N.L.R.B.*, 628 F.2d at 709, and that they did not responsibly direct other employees as the employer or as his representative. *Westinghouse Electric Corp. v. N.L.R.B.*, 424 F.2d 1151, 1156 (7th Cir.), *cert. denied*, 400 U.S. 831, 91 S.Ct. 63, 27 L.Ed.2d 62.

The case before us is unlike *American Broadcasting Cos., Inc. v. Writers Guild of America, West, Inc.*, 437 U.S. 411, 414–15 nn.1 and 2, 419 n.8, 421–22, 434, 98 S.Ct. 2423, 2426–2427 nn.1 and 2, 2428 n.8, 2429–2430, 2436, 57 L.Ed.2d 313, where the Court, in reversing the denial of enforcement, indicated that television and film directors with much greater authority and responsibility than the Meredith directors were supervisors. While the issue is troublesome here and the Regional Director might have reached a different result, we must remember that the Regional Director is permitted a large measure of informed discretion on such judgments. We cannot say there was an abuse of discretion here. There was substantial evidence tending to show that the directors functioned merely to coordinate other members of the production team. For example when one director was asked his relationship to a commercial production, he testified (III R. 176):

---

5. Moreover, this is not a situation, as was present in *N. L. R. B. v. Dillon Stores*, 643 F.2d 687, 691 (10th Cir.), where the lack of in-house supervision gives rise to an inference that the commercial director is a supervisor. The general manager, program manager, production manager and assistant production manager are presumably at the station during normal working hours. Additionally, there was evidence indicating that the production manager was in the production studio, at least occasionally. (*See* III R. 244). Thus the situation here is distinguishable from that in *Dillon Stores.*

[I]t's a joint venture with the, six or seven professionals. I'm acting as a facilitator and just conveying information from the producer to these other professionals.

While there was other evidence tending to show that the responsibility of the director was greater than this description, the evidence as a whole supports the finding that the directors were not supervisors.[6]

Meredith points to several older Board decisions finding television directors to be supervisors. *Great Western Broadcasting Corp.*, 192 N.L.R.B. 1203 (1971); *WTAR Radio-TV Corp.*, 168 N.L.R.B. 976 (1967); *Radio & Television Station WFLA*, 120 N.L.R.B. 903, 905 (1958); *Northwest Publications, Inc.*, 116 N.L.R.B. 1578, 1579 (1956); *WTOP, Inc.*, 114 N.L.R.B. 1236 (1955); *American Broadcasting Co. (KGO–TV)*, 94 N.L.R.B. 100 (1951). The Board responds that these cases involved directors with far more control over the production crew employees and more authority over the actual production than is found in the instant case and are therefore factually distinguishable. The Board, in fact, distinguished its earlier opinions in *Westinghouse Broadcasting Co. (WBZ–TV)*, 215 N.L.R.B. at 123, 125:

> Prior Board decisions which have found that Producer/directors or directors do responsibly direct other employees are factually distinguishable. The production roles of individuals considered therein

typically involved authority tantamount to "full responsibility from the planning stage through the presentation on the air." [*Great Western Broadcasting Corp.*, 192 N.L.R.B. 1203]. The responsibilities of producer/directors at WBZ . . . are far more circumscribed.

We have examined the older cases cited by Meredith, and do not find them persuasive here.

Meredith also takes issue with the Board's position as announced in its post–1974 decisions, that direction of employees which is motivated by "artistic effect" does not qualify as responsible direction within the meaning of § 2(11). Meredith points to statements made by the Board in *Westinghouse Broadcasting Co., Inc. Co. (WBZ–TV)*, 215 N.L.R.B. at 125, one of the cases relied on by the Regional Director below, and *Golden West Broadcasters*, 215 N.L.R.B. at 761, both of which were noted above. In *Westinghouse*, the directors' instructions were characterized as being "either routine in nature or motivated by artistic effect." In *Golden West* the Board stated that the "instructions are routine or artistic in nature." Meredith concedes that their directors are motivated by artistic considerations but argues that the directors' responsible direction is not lessened thereby. Meredith places reliance on the dissent of Board Member Kennedy in *Golden West*.[7] (Brief of Appellant at 20–22; Reply

---

**6.** In upholding a ruling that university faculty members were endowed with managerial status, in *N. L. R. B. v. Yeshiva University*, 444 U.S. 672, 690 n.30, 100 S.Ct. 856, 866 n.30, 63 L.Ed.2d 115, the Court noted approvingly that architects and engineers functioning as project captains for work performed by teams of professionals have been deemed employees, despite substantial planning responsibility and authority to direct and evaluate team members; the Court referred to the "routine discharge of professional duties." *Id.* at 690, 100 S.Ct. at 866.

**7.** In his dissent, Member Kennedy stated (215 N.L.R.B. 762–63):

My colleagues state that the staff directors at KTLA do not "responsibly direct" employees. According to the majority, any instruc-

tion given by the staff director is "either routine or artistic in nature." Assuming, *arguendo*, that the staff directors' instructions or directions are "only" artistic in nature, on what basis does this automatically remove such directions or instructions from the realm of "responsible direction" as used in Section 2(11) of the Act?

The record indicates that the staff directors' very *raison d'etre* is to make the final determination as to the form and nature of the image seen on the home television screen. Thus, the staff director accomplishes this task by "responsibly directing" the other members of the telecast crew.

\* \* \* \* \* \*

Brief at 8–11). Meredith also says that the "responsibly to direct" language was intended to be construed broadly to insure that management had the undivided loyalty of its supervisors, citing 93 Cong.Rec. 4804 (1947); H.R.Rep.No.245, 80th Cong., 1st Sess. 16, 17 (1947); *Beasley v. Food Fair of North Carolina*, 416 U.S. 653, 660–62, 94 S.Ct. 2023, 2027–2028, 40 L.Ed.2d 443; *Ohio Power Co. v. N. L. R. B.*, 176 F.2d 385 (6th Cir.), *cert. denied*, 338 U.S. 899, 70 S.Ct. 249, 94 L.Ed. 553. (Brief of Appellant at 12–14, 22–24; Reply Brief at 10–11).

While it is troubling that the Board in its post-1974 decisions has failed to explain convincingly why an artistic motivation deprives directors of supervisory status, we feel the artistic motivation point is not of controlling importance here. It is only one of several factors noted by the Regional Director with respect to the commercial directors' functions,[8] and is not mentioned in connection with the news directors. The Regional Director expressly relies, as does the Board in its post-1974 decisions, on the limitations placed on the directors' authority. In the post-1974 decisions the Board refers to limitations imposed by pre-existing production policies or detailed guidelines of a script. Although there is little evidence here as to pre-existing production policies,[9] there was substantial evidence concerning the constriction of directors' responsibility by scripts, storyboards and the ultimate authority of the producers. Thus the Regional Director could reasonably find that each director was merely "one of the gang who gives routine instructions."

Additionally, we are not persuaded by Meredith's argument concerning legislative history. The *Ohio Power Co.* case relied on by Meredith states that the language of the

---

Thus, the staff directors are responsible for KTLA's "on-the-air" operations, and its end product: a technically and artistically acceptable broadcast.

&ast; &ast; &ast; &ast; &ast; &ast;

In my opinion, the above mentioned responsibilities are neither routine nor clerical. In part, they may be of an artistic nature; however, Section 2(11) does not, as I read the section, state that "responsible direction" cannot be of an artistic nature.

8. The finding on artistic motivation of commercial directors is emphasized below in the pertinent portion of the Regional Director's findings concerning commercial directors (I R. 331–32):

The commercial directors normally work from 8:00 a. m. to 5:00 p. m. At the end of each day, a commercial director checks to see what commercials he will produce the following day. The director attends a pre-production meeting with the client wherein the latter provides the director with a prepared script which provides the format and content of the commercial. In addition, the client usually provides the director with a "storyboard" which details how each segment of the commercial is to look. The director examines both the script and "storyboard" and tells the stagehands the props to be used. In the event special props are needed, Chance or Gollege must give approval.

When the commercial is shot, the director, producer and client are present. The director directs the production from the client's script. *In this regard, he assigns tasks to the production crew; however, such assignments either follow established policies or procedures or are done to accomplish a certain artistic effect.* Talent performing the commercials, as well as the producer, are hired by the client. All decisions during the shooting of the commercial are made by the producer, but the client has the final approval. In the event the commercial runs longer than the time purchased by the client, the producer, after discussion with the client, must approve any editing to bring it within the time purchased. In the event production extends past normal working hours, the decision to do so rests with the client. Although directors are paid on a salary basis, they receive overtime compensation for work performed beyond normal working hours. Further, while, on occasion, the director has formally complained about personnel on the production crew, he makes no recommendations as to corrective action. (Emphasis added).

9. In a footnote, Meredith points to the fact that the director is not constrained by any authority in the process of blocking, whereby the news director marks the cameras and angles he intends to use on the show format. (Brief of Appellant at 21 n.6). We feel it was reasonable to infer that this process and the instructions later given by the director to crew members do not amount to responsible direction within the meaning of § 2(11).

statute is clear and that resort to legislative history is not required, although the court there held against the Board on a "responsible direction" of employees question. 176 F.2d at 387–88. Moreover, the Regional Director's decision is consistent with the statute's legislative intent, as asserted by Meredith. The statutory purpose is adequately served by recognizing supervisory status only in those who represent the interests of the employer vis-a-vis other employees and are not "one of the gang who merely gives routine instructions." *See Goldies, Inc. v. N. L. R. B.*, 628 F.2d at 709.

In sum, we hold that Regional Director's finding that the directors are not supervisors is supported by substantial evidence. What we have said about directors applies equally to the production assistants. When a production assistant directs other employees, he does so in a manner similar to that of a director. Thus the finding that production assistants are not supervisors is also supported by substantial evidence.

Accordingly, the petition for review is denied. The order will be enforced.