**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SHEET METAL WORKERS INTERNATIONAL ASSOCIATION, LOCAL 104, AFL–CIO, Respondent.**

No. 93–70753.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 15, 1995.

Decided Aug. 8, 1995.

Robert H. Miller, San Francisco, CA, Aileen A. Armstrong, Charles Donnelly, N.L.R.B., Washington, DC, for petitioner.

Kathryn A. Sure, Mark S. Renner, Wylie, McBride, Jesinger, Sure & Platten, San Jose, CA, for respondent.

Before CHOY, CANBY, and T.G. NELSON, Circuit Judges.

CANBY, Circuit Judge:

The National Labor Relations Board petitions for enforcement of its order prohibiting Sheet Metal Workers International Association, Local 104, AFL–CIO (the "Union") from imposing discipline on one of its members, Douglas Henry. The Board held that the Union violated section 8(b)(1)(B) of the Act, 29 U.S.C. § 158(b)(1)(B), because its discipline had the effect of coercing Henry in his collective bargaining and grievance adjusting activities on behalf of his employer. We deny enforcement of the Board's order.

## BACKGROUND

Douglas Henry was employed as a foreman for Simpson Sheet Metal, Inc., a contractor based in Santa Rosa, California. Simpson sold, installed and serviced heating and cooling systems. Henry's duties included estimating for bids on new jobs, supervising commercial and residential installations, occasionally dispatching crews, and adjusting employee travel pay errors. Henry did not participate in collective bargaining with the Union or in formal grievance adjustment procedure, both of which functions were left to the company's president.

Henry was also a long-standing member of the Union, with which Simpson had a collective bargaining agreement. The agreement specified rates of pay for work within the Santa Rosa area, and travel allowances for work outside the area. The agreement also referred to different work rules and pay rates for work performed outside the Santa Rosa area.

In 1989, the Union disciplined Henry for: 1) directing employees to work in San Francisco under Santa Rosa rules, rather than under San Francisco rules that would have mandated a shorter workday and workweek; 2) assigning to a San Francisco project workers whose job classifications were prohibited by the San Francisco rules; and 3) failing to ensure that correct travel mileage was paid. Henry contested each of these charges. The Union nevertheless found against Henry, fined him $10,000, and placed him on probation. The Union suspended one-half of the fine.

Henry and Simpson filed an unfair labor practice charge with the Board, claiming that the Union disciplined Henry in violation of section 8(b)(1)(B) of the National Labor Relations Act. This section precludes union interference with the employer's selection of

its representatives for purposes of collective bargaining or grievance adjustment.

An administrative law judge upheld the Union's discipline, finding that section 8(b)(1)(B) did not protect Henry from discipline as an employer representative. Upon review, the Board disagreed with the ALJ, determining that Henry was a section 8(b)(1)(B) representative entitled to the Act's protection. The Board thus held that the Union had violated the section, and ordered it to rescind all charges and actions against Henry.

## ANALYSIS

Section 8(b)(1)(B) of the Act prohibits a labor union or its agent from "restrain[ing] or coerc[ing] an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances." 29 U.S.C. § 158(b)(1)(B). The Supreme Court has interpreted the section to prohibit certain union discipline of members whom the employer has also selected as its representative for the above purposes. *Florida Power & Light v. IBEW*, 417 U.S. 790, 94 S.Ct. 2737, 41 L.Ed.2d 477 (1974). The Court has reasoned that Congress intended section 8(b)(1)(B) to prevent a union from exerting control over the employer's choice of representative either by forcing the representative to resign his bargaining post or by influencing him to act more favorably toward the union than he otherwise would during collective bargaining or grievance adjustment activities. *See National Labor Relations Board v. IBEW*, 481 U.S. 573, 581–82, 107 S.Ct. 2002, 2008, 95 L.Ed.2d 557 (1987) [hereinafter *"Local 340"*].

### I. Collective Bargaining and Contract Interpretation

The Board in the past has attempted, without ultimate success, to read and apply section 8(b)(1)(B) very broadly. At one time it extended the protection of the section to virtually all supervisory employees, on the theory that they were potential collective bargaining representatives of the employer. *IBEW, Local 340 (Royal Electric)*, 271 N.L.R.B. 995, 997, 1984 WL 36751 (1984), *enforcement denied*, 780 F.2d 1489 (9th Cir.

1986), *aff'd*, 481 U.S. 573, 107 S.Ct. 2002, 95 L.Ed.2d 557 (1987); *Teamsters Local 296 (Northwest Publications)*, 263 N.L.R.B. 778, 779 n. 6, 1982 WL 23899 (1982); *Toledo Lithographers Locals 15–P and 272 (The Toledo Blade Co.)*, 175 N.L.R.B. 1072 (1969), *enforced*, 437 F.2d 55 (6th Cir.1971). As discussed by the Supreme Court in *Local 340*, the Board's rationale was that all

> supervisors constitute a reservoir of workers available for selection at some future date as collective bargaining agents or grievance adjusters.... [I]f a union is permitted to discipline a supervisor-member, even one without § 8(b)(1)(B) duties, the union discipline *might* affect the supervisor's loyalty to his or her employer, the effect of that discipline *might* linger, a smaller pool of loyal supervisors *might* be available, and the employer *might* therefore be restricted in its *future* choice of representatives for § 8(b)(1)(B) purposes.

481 U.S. at 586, 107 S.Ct. at 2010 (discussing and dismissing the doctrine).

In *Local 340*, the Supreme Court firmly rejected the "reservoir" approach. In so doing, the Court cited *Florida Power & Light v. IBEW*, 417 U.S. 790, 94 S.Ct. 2737, 41 L.Ed.2d 477 (1974), for the proposition that the collective bargaining activities protected by section 8(b)(1)(B) are to be narrowly viewed. "Both the language and the legislative history of § 8(b)(1)(B) reflect a clearly focused congressional concern with the protection of employers in the selection of representatives to engage in two *particular* and *explicitly stated activities*, namely collective bargaining and the adjustment of grievances." *Florida Power*, 417 U.S. at 803, 94 S.Ct. at 2744 (emphasis added). Thus both *Local 340* and *Florida Power* demonstrate that section 8(b)(1)(B)'s protection extends only to a subset of those persons identified as supervisors, who perform specifically identified duties of collective bargaining or grievance adjustment.

Again today, in Henry's case, the Board asserts a theory of section 8(b)(1)(B) that is almost as expansive as its discredited "reservoir" theory. There is no dispute that Henry was not authorized to engage in col-

lective bargaining with the Union on behalf of his employer. The Board, however, contends that Henry qualifies as a "collective bargaining representative" because he "interprets" the collective bargaining agreement on behalf of Simpson. Applied to the undisputed facts of this case, such an interpretation of section 8(b)(1)(B) expands that section's boundaries far beyond the narrow scope specified by the Supreme Court in *Local 340* and *Florida Power.*

Henry's "interpretation" of the collective bargaining agreement, according to the Board, consisted in assigning his air conditioning specialists to commercial work and calculating the correct travel mileage. The Board focuses particularly on Henry's role in correcting a travel payment for one Mr. Sabbatino. But there was no "interpretation" of the collective bargaining agreement to be done in that or the cases in which Henry made certain that workers received their proper travel pay. There was no dispute between the Union and the employer, or even with the employee, as to when travel pay was required under the contract. Henry simply measured the distance a worker had to travel to the job site, consulted the agreement for the appropriate travel pay rate, and compared it with the employee's pay check. These actions are not "contract interpretation" for purposes of section 8(b)(1)(B). To hold otherwise would be to convert every instance in which a supervisor merely followed or applied the contract into one of contract interpretation. That result is contrary to the usual meaning of the term "contract interpretation," and in no way furthers Congress's objective of protecting employers against restraint or coercion in selecting its representatives for collective bargaining or grievance adjustment, as set forth in section 8(b)(1)(B).[1]

The Board seizes on a statement of the Supreme Court in *Local 340* limiting section 8(b)(1)(B) activities to "collective bargaining, grievance adjustment, or some other closely related activity (e.g., contract interpretation, as in *Oakland Mailers*)." *Local 340,* 481 U.S. at 586, 107 S.Ct. at 2010. But this statement was part of a *restrictive* definition of activities protected by section 8(b)(1)(B). The Supreme Court acknowledged in *Local 340* that the Board's decision in *San Francisco–Oakland Mailers Union No. 18 (Northwest Publications, Inc.),* 172 N.L.R.B. 2173 (1968) (*Oakland Mailers*), which precluded Union discipline aimed at forcing supervisors to take pro-union positions in interpreting collective bargaining agreements, was "at best 'within the outer limits'" of section 8(b)(1)(B). *Local 340,* 481 U.S. at 581, 107 S.Ct. at 2008 (quoting *Florida Power,* 417 U.S. at 805, 94 S.Ct. at 2745). The Court also favorably cited commentators who stated that the Court, while not specifically overruling *Oakland Mailers,* seemed to be restricting its expansive interpretation of section 8(b)(1)(B). *Id.,* 481 U.S. at 582 n. 5, 107 S.Ct. at 2008 n. 5. We cannot read *Local 340* as endorsing in any manner the Board's view that Henry's daily supervisory activities, carried out in conformity with and by reference to the collective bargaining agreement, constituted "interpretation" that would somehow bring Henry within the protection of section 8(b)(1)(B).[2] Under such reasoning, every supervisor would fall within the protection of section 8(b)(1)(B) by reason of his or her routine acts.[3]

It may be that the Board's expansive view of section 8(b)(1)(B) comes, as it did in the

1. Alternatively, if Henry's activities are characterized as "interpretation" of the collective bargaining agreement, they still are not closely enough related to the processes of collective bargaining or adjustment of grievances to come within section 8(b)(1)(B). *See Local 340,* 481 U.S. at 586, 107 S.Ct. at 2010–11.

2. The Board relied in part on its understanding that the Union brought charges against Henry "because of his alleged interpretation of the contract." The Union's charging letter, however, simply alleges that Henry acted in contravention

of the contract; it does not refer to an "interpretation" by Henry.

3. Examples of such activities might include: supervisor authorization of overtime as called for in the applicable agreement; supervisor allotment of "clean-up time" within the work period; assignment of work crews to conform with agreement requirements. Each of these provisions is delineated in the agreement; each is implemented on a daily basis by line foremen. None affects the employer's collective bargaining position.

case of the "reservoir" doctrine, from a distaste for the conflict of loyalties engendered when supervisors are subject to union discipline. But the Supreme Court, in rejecting the Board's reservoir doctrine and adopting its narrow interpretation of section 8(b)(1)(B), acted with a full realization that it was leaving most such conflicting loyalties in place. *Id.* at 583, 107 S.Ct. at 2009. Section 8(b) was not intended to address the problems of loyalty conflicts in general. *See id.* Those problems, the Court reasoned, were the natural result of an employer allowing its supervisors to retain their union memberships, and were outside the scope of the section.

We return to the test of *Florida Power*: "a union's discipline of one of its members who is a supervisory employee can constitute a violation of § 8(b)(1)(B) only when that discipline may adversely affect the supervisor's conduct in performing the duties of, and acting in his capacity as, grievance adjuster or collective bargainer on behalf of the employer." *Florida Power*, 417 U.S. at 804–05, 94 S.Ct. at 2744–45. Applying that test to the case at hand, we conclude that Henry's actions are not protected by section 8(b)(1)(B) as collective bargaining activities. Nor are Henry's activities that the Board identifies as "contract interpretation" so closely related to collective bargaining that the Union's discipline will have the requisite adverse effect on present or future collective bargaining activities. *See Local 340*, 481 U.S. at 586, 107 S.Ct. at 2010–11. The Union disciplined Henry for ordering its members to work under inapplicable contract rules. The only foreseeable result of this discipline will be to deter him from violating the existing and future contract rules about work assignment. The discipline in no way "adversely affects" Simpson Sheet Metal's representation in either the collective bargaining or grievance adjustment processes. In short, any harm caused by the Union's discipline here is not the sort that section 8(b)(1)(B) was intended to prevent. We therefore conclude that section 8(b)(1)(B) does not extend to protect Henry as an "interpreter" of the collective bargaining agreement.

## II. Henry's Section 8(b)(1)(B) Status as Grievance Adjustor

■ The Board urges in the alternative that Henry was engaged in the adjustment of grievances. This assertion is also incorrect in light of the undisputed facts.

The Board identifies as "grievance adjustment" Henry's role in correcting travel pay for one worker, a Mr. Sabbatino.[4] Substantively, the travel pay problem in question is not a grievance. Both the employer and Union agreed that workers traveling outside their respective twenty mile "free zones" were entitled to travel pay for the days they so traveled. The employer fully expected to dispense travel pay whenever it was due, as evidenced by Henry's past conduct in issuing immediate correction notes to the payroll office when approached by a worker with a payroll discrepancy. In each case that occurred before the Union filed the charge against Henry, travel pay mistakes apparently were corrected without confrontation or any notice of the employer's intent to oppose the pay adjustment. The errors that the Board identifies no more create "grievances" than does the erroneous dispatch of a work crew to an incorrect address. There is a qualitative difference between adjustment of "grievances" and corrections of mere mistakes when an employee calls attention to them.

Nor did the pay problem rise procedurally to the level of a grievance. As the ALJ correctly found, everyday responses to employee problems and corrections of what are admitted payroll errors are simply too premature to be so classified. No formal or even semi-formal "grievance" had been filed. Certainly, Henry had no dealing with the union or its representative in simply noting a correction to payroll. Most important, Henry was not authorized to deal with the Union on behalf of Simpson. In sum, Henry was acting as would any other supervisor in di-

---

**4.** Henry had actually adjusted travel pay more than once, but the Board points specifically only to his involvement in the Sabbatino payroll correction to support its argument that Henry engaged in grievance adjustment. Whether Henry corrected payroll once or often is, as will be discussed, immaterial to our analysis.

recting his crew and seeing to their individual needs. Were we to classify the travel pay problem as a grievance and Henry's correction of that problem as grievance adjustment, once again every line supervisor would be converted by his or her routine activities into a section 8(b)(1)(B) representative for purposes of protection from union discipline. As we have said, Congress did not intend to cast its net that widely in enacting the section.

## CONCLUSION

However harsh the Union's discipline may appear for Henry's involvement in these activities, the ALJ correctly recognized that Henry's redress does not lie within section 8(b)(1)(B). The section does not prohibit the Union's discipline here. We deny enforcement of the Board's order.

**ENFORCEMENT DENIED.**