**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 23 2001**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

PUBLIC SERVICE COMPANY OF
COLORADO,

      Petitioner and Cross -
      Respondent,

v.

NATIONAL LABOR RELATIONS
BOARD,

      Respondent and Cross -
      Petitioner,

---

INTERNATIONAL BROTHERHOOD
OF ELECTRICAL WORKERS,
LOCAL NO. 111,

      Intervenor.

Nos. 00-9523, 00-9532

---

**On Petition for Review and Cross-Application
for Enforcement of an order of the
National Labor Relation Board
(NLRB No. 27-CA-16820-1, 27-RC-7997)**

---

Charles Donnely, Supervisory Attorney, Rachel Gartner, Attorney, Leonard R.
Page, General Counsel, John H. Ferguson, Associate General Counsel, Aileen A.
Armstrong, Deputy Associate General Counsel, National Labor Relations Board
Washington D.C., on the brief for Respondent and Cross-Petitioner.

Kevin W. Hecht (Todd Q. Clarke with him on the brief), of White and Steele, P.C., Denver, Colorado for Petitioner and Cross-Respondent.

Joseph M. Goldhammer (Susan J. Eckert with him on the brief), of Brauer, Buescher, Valentine, Goldhammer, Kelman & Eckert, P.C., Denver, Colorado for Intervenor.

---

Before **BRISCOE**, **McKAY**, and **HALL**, Circuit Judges.[*]

---

**HALL**, Circuit Judge.

This case involves a petition for review and cross-petition for enforcement of an order of the National Labor Relations Board ("NLRB" or the "Board"). The Board determined that the Public Service Company of Colorado ("Public Service" or the "Company") violated § 8(a)(1) and (5) of the National Labor Relations Act (the "NLRA" or the "Act"), 29 U.S.C. § 158(a)(1) and (5), by refusing to bargain with the International Brotherhood of Electrical Workers, Local No. 111 (the "Union") as the representative of certain employees. Public Service maintains that its refusal was justified because the employees at issue qualify as "supervisors" within the meaning of § 2(11) of the Act, 29 U.S.C. § 152(11).

This court has jurisdiction to enforce and review the Board's order under § 10(e) and (f) of the NLRA. While we do not have general jurisdiction over the representation proceeding, § 9(d) of the Act authorizes review of the Board's

---

[*]The Honorable Cynthia Holcomb Hall, Senior United States Circuit Judge for the Ninth Circuit, sitting by designation.

action in that proceeding for the purpose of deciding whether to "enforc[e], modify[], or set[] aside in whole or in part the [unfair labor practice] order of the Board." 29 U.S.C. § 159(d). Because the NLRB used an impermissible standard in determining that the employees were not "supervisors," we set aside its bargaining order and deny enforcement.

I.

Factual and Procedural Background

Public Service is a public utility that provides electric power and gas to customers in Colorado and parts of Wyoming. Since 1946, the Union has represented a bargaining unit of the Company's operating, production and maintenance employees. Public Service and the Union have entered into a series of collective bargaining agreements, the most recent of which will expire in 2003.

This dispute centers on the status and responsibilities of three sets of the Company's employees: transmission operators, senior transmission operators, and senior system operators (collectively, "transmission employees"). In general terms, transmission employees are responsible for monitoring and directing the flow of electricity over the Company's high voltage transmission network. This network consists of transmission lines that carry power from generating plants to distant substations where it is converted to usable current and subsequently sent out to customers over distribution lines. In addition to managing the flow of

electricity over these transmission lines, transmission employees also partially oversee power generation and work at the substations.

More specifically, the first two categories of transmission employees--transmission operators and senior transmission operators (herein collectively "transmission operators")--are primarily responsible for the manipulation of the transmission network in order to facilitate routine and emergency maintenance and construction activities. Working out of the Company's main electrical operations control center in Golden, Colorado, their major duty is to design and oversee the implementation of so-called "switching procedures." Typically, the need for switching procedures arises when linemen working in the field place telephone requests indicating that they need to perform maintenance or repairs on specific pieces of equipment. The transmission operators review the requests and determine whether it is feasible for the work to be performed at the proposed time given the demand load on the system. If a transmission operator agrees to a request, he will schedule the work and prepare a detailed "switching order" that indicates the precise steps that must be taken to disengage power lines and reroute transmission so that the work can be accomplished safely and without interruption of service to customers.

After a switching order is prepared, arrangements are made for electricians to report to the appropriate sites in the field. A field supervisor is usually

responsible for deciding which employees to deploy to perform the switching. Once the switching personnel are in place, the transmission operator reads the step-by-step procedure to them over the telephone as they perform the switches. If the transmission operator decides that an unsafe condition has arisen or that the field personnel are not performing the switching properly, he may order that work stop until the problem is resolved.

Transmission operators are also responsible for several monitoring and emergency functions. They monitor the transmission lines on a computer system known as SCADA [**2] to ensure that the system is running within normal parameters. They also monitor alarms installed in the substations to alert them to potential problems. When SCADA indicates that there has been either a surge or drop in voltage, the transmission operators are responsible for restoring the system to normal parameters either by making computer-controlled adjustments to the system themselves, or by instructing control operators at the generating plants to change their electrical output. In the event of multiple alarms, transmission operators are responsible for prioritizing problems and deploying the available field employees in order to effect timely repairs and maintain system stability. In the event of an actual system emergency such as a downed transmission line or

---

[2] SCADA stands for supervisory control and data acquisition.

other break in service, transmission operators are responsible for stabilizing the system and restoring services. In such situations, they may directly assign field employees to make repairs as needed.

Senior system operators are generally promoted from the ranks of transmission operators and perform the same functions. In addition, they are responsible for safely operating the electrical generation system and making certain that generation matches demand. This requires that they make daily demand predictions used to set generation levels. They then monitor the system throughout the day to make any necessary adjustments to load requirements. Senior system operators effect these adjustments by telephoning the control operators at generating plants and issuing orders to either change the rate of generation or the number of units that are on-line. In an emergency situation, such as where there is a loss of generation, senior system operators can also purchase power from neighboring utilities. [3]

As a group, transmission employees are expected to exercise substantial discretion in carrying out their duties. There are no manuals laying out detailed

_____

[3]Pursuant to regulations adopted by the Federal Energy Regulatory Commission ("FERC"), utilities must separate the reliability function from the market function in energy trading. Thus, senior system operators are allowed to purchase electricity only in emergency situations when it is necessary to ensure the reliability of the system. Decisions to trade electricity with other utilities for economic reasons are made by another department.

orders as to how they are to design switching orders or carry out their other tasks. Rather, transmission employees are expected to use their judgment, experience and training to devise solutions to the complex and often novel problems that they face. In doing so, they have a high degree of responsibility and give orders which must be carried out with precision and competence in order to ensure the safety of field employees and the integrity of the Company's network as well as those of interconnected utilities. However, though they may stop the work of field employees when necessary, they do not have the authority to reward or discipline such employees based on their performance in carrying out their orders.

The issue of the transmission employees' status first arose in 1989 when the Union successfully petitioned the NLRB to represent the Company's dispatch employees in its bargaining unit (the "1989 proceeding"). During the 1989 proceeding, the parties stipulated that the Company's senior systems operators were managerial employees under the Act, and therefore not subject to representation. The status of the Company's transmission operators and senior transmission operators was submitted to the NLRB Regional Director, who, relying on the Board's decision in Big Rivers Electric Corp., 266 NLRB no. 380, 1983 WL 24962 (1983) (holding that an electric utility's system supervisors were statutory supervisors under § 2(11) of the Act), determined that they were statutory supervisors not subject to representation under the Act.

For ten years, the transmission employees' supervisory status appeared clear. However, in July 1999, the Board issued a ruling in Mississippi Power & Light Co., 328 NLRB No. 146, 1999 WL 551405 (1999), in which it overruled Big Rivers and held that employees who monitor and oversee electrical distribution systems are not statutory supervisors under the Act. Thereafter the Union petitioned the Board anew, seeking specifically to represent the Company's transmission employees. After a hearing, the Regional Director reversed his earlier determination, and concluded on the basis of Mississippi Power that the transmission employees were not statutory supervisors exempted from the NLRA's collective bargaining provisions. Despite the 1989 stipulations to the contrary, the Regional Director also found that the senior systems operators were subject to representation. The Company's timely request for NLRB review of the Regional Director's decision was denied and transmission employees subsequently elected to join the Union.

Because direct judicial review of Board's representation determinations is unavailable, AFL v. NLRB, 308 U.S. 401, 409-411 (1940), the Company sought indirect review by refusing to bargain with the Union. The Board's general counsel responded by bringing an unfair labor practice complaint against the Company, alleging violations of § 8(a)(1) and (5) of the Act, 29 U.S.C. § 158(a)(1) and (5). On June 14, 2000, the Board granted summary judgment

against the Company and ordered it to bargain with the Union. In response, the Company petitioned this court for review of the orders in both the representation proceeding and the unfair labor practice proceeding. The Board cross-petitioned for enforcement of its order in the unfair labor practice proceeding. The Union intervened on behalf of the Board.

## II.

## Discussion

Public Service first argues that the transmission employees qualify as § 2(11) supervisors because they exercise independent judgment in connection with the assignment and direction of other employees. The Company also contends that the Board's finding that such employees are not supervisors was based on an erroneous interpretation of §2(11) that is contrary to its plain language. We agree with the latter contention and need not consider the former.

An individual employed as a "supervisor" is not subject to protection under the NLRA. 29 U.S.C. §§ 152(3), 157. Section 2(11) defines a supervisor as:

> any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11). Because "this section is framed in the disjunctive, the

existence of any one of the listed powers, as long as it involves the use of independent judgment, is sufficient to support a determination of supervisory status." Meridith Corp. v. NLRB, 679 F.2d 1332, 1335 (10th Cir. 1982).

Section 2(11) thus sets forth a three-part test for determining supervisory status:

> Employees are statutory supervisors if (1) they hold the authority to engage in any 1 of the 12 listed supervisory functions, (2) their "exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment," and (3) their authority is held "in the interest of the employer."

NRLB v. Kentucky River Community Care, Inc., 121 S.Ct. 1861, 1867 (2001). In the instant case, relying on Mississippi Power, the Regional Director concluded that the transmission employees do not exercise independent judgment in regard to assigning or directing the work of field employees sufficient to warrant a finding of supervisory status.

Whether or not a particular group of employees sufficiently exercise independent judgment in connection with one of twelve listed responsibilities is a question of fact. The Board's factual findings must be upheld if they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e); see also Four B Corp. v. NLRB, 163 F.3d 1177, 1182 (10th Cir. 1998); Medite of New Mexico, Inc. v. NLRB, 72 F.3d 780, 785 (10th Cir. 1995). However, because the Board's factual findings were based on the new legal

-10-

interpretation of "independent judgment" articulated in Mississippi Power , we must first answer the threshold question whether the Board's legal judgment is permissible under the Chevron standard . Chevron USA, Inc. v. Natural Resource Defense Council, Inc ., 467 U.S. 837 (1984) , see also Four B. Corp ., 163 F.3d at 1182 (quotations omitted). The Supreme Court has previously noted that "independent judgment" is an ambiguous term. See Kentucky River 121 S.Ct at 1867, NLRB v. Town & Country Elec., Inc ., 516 U.S. 85, 89-90 (1995). Under Chevron , the Board's construction of such a provision of the NLRA is therefore entitled to deference unless the court cannot say that it is a "permissible construction" of the statute. 467 U.S. at 842-43. Thus, this court must determine whether the interpretation of independent judgment articulated in Mississippi Power is reasonable. [4]

In Mississippi Power , the Board adopted a categorical distinction between kinds of independent judgment to determine that the employees in that case were not supervisors as defined by the Act. The Board acknowledged that the distribution dispatchers at issue in that case would have been considered supervisors under Big Rivers . Mississippi Power, 1999 WL 551405 at 9.

---

[4]The Petitioner argues that the Board's legal determination in this case is entitled to a lesser degree of deference because it has taken inconsistent positions on interpreting § 2(11) and applying it to electrical utility dispatchers. For the reasons set forth below we need not reach this issue.

However, citing changes in the workplace "due to increasing technological innovation," an "invitation" from the First Circuit, and an incorrect weighing of factors, the Board concluded that Big Rivers failed to appreciate the nature of "the type of quasi-professional, quasi-overseer" employee at issue. Id. at 8. Relying on a line of argument developed in a series of cases dealing with the status of charge nurses, the Board held that the evidence failed to show "that the dispatchers' assignment and direction require the use of supervisory 'independent judgment.'" Id. at 11. In its view, "the exercise of judgment pursuant to an employee's professional, technical, or experienced special knowledge or expertise does not translate into supervisory status." Id. at 8. The Board concluded that the judgment exercised by the distribution dispatchers related only to the employees' "own responsibilities, [was] based on their experience and technical expertise, [and did] not evidence any control over personnel." Id. at 13.

Since the decision in Mississippi Power, the Board's reading of independent judgment has been rejected by the Supreme Court. In NLRB v. Kentucky River Community Care, 121 S.Ct. 1861 (2001), the Supreme Court affirmed the 6th Circuit's refusal to enforce the Board's bargaining order in a case having to do with the status of charge nurses. The Board had interpreted §2(11) to mean that "employees do not use 'independent judgment' when they exercise 'ordinary professional or technical judgment in directing less-skilled

-12-

employees to deliver services in accordance with employer-specified standards.'" Id at 1867 (quoting Brief for Petitioner). The court acknowledged that the "term 'independent judgment' is ambiguous with respect to the *degree* of discretion required for supervisory status...[and it] falls clearly within the Board's discretion to determine, within reason, what scope of discretion qualifies." Id. The Court also recognized that "the degree of judgment that might ordinarily be required to conduct a particular task may be reduced below the statutory threshold by detailed orders and regulations issued by the employer." Id.

The Court, however, rejected the Board's argument that "the judgment even of employees who are permitted by their employer to exercise a sufficient *degree* of discretion is not 'independent judgment' if it is a particular *kind* of judgment, namely, 'ordinary professional or technical judgment in directing less-skilled employees to deliver services.'" Id. (quoting Brief for Petitioner) The Court held that exclusion of "ordinary professional or technical judgment...insert[ed] a startling categorical exclusion into statutory text that does not suggest its existence." Id. "The text, by focusing on the 'clerical' or 'routine' (as opposed to 'independent') nature of the judgment, introduces the question of degree of judgment....But the Board's categorical exclusion turns on factors that have nothing to do with the degree of discretion an employee exercises." Id. at 1867-68. The Court further noted that the Board's extension of the exclusion to

"judgment based on greater experience...would virtually eliminate 'supervisors' from the Act." Id. at 1868. Thus, the Board is not permitted to employ the kind of categorical distinction that was used to determine the non-supervisory status of transmission employees in this case.

The Union argues that the standard in Mississippi Power is distinguishable from that used in Kentucky Railroad because it focuses on the *application* of "independent judgment" rather than its *basis*. That is, the Union seeks to draw a line between the act of directing employees as they go about their tasks and that of directing the tasks themselves. It argues that supervisory status is established under Mississippi Power only where the independent judgment is with reference to the problem of directing employees or carrying out one of the other 11 tasks enumerated in § 2(11) rather than solving concrete technical problems on which co-workers might be working. Under such a test, if one employee merely passes on instructions on how to solve a technical or practical problem, that employee has not exercised "independent judgment" in connection with "responsible direction" of "other employees" regardless of the amount of independent judgment that went into the solution of the actual problem. By contrast, if that employee exercised independent judgment in individually tailoring those instructions or otherwise acting to assure a particular co-worker's effectiveness, the employee presumably would be acting as a "supervisor."

The problem with this argument is that it is not supported by the language of <u>Mississippi Power</u> itself. In addition to the language cited above, that decision specifically traces the standard that it applies to the line of charge nurse cases overturned by <u>Kentucky River</u>. <u>Mississippi Power</u> at 9, citing <u>Providence Hospital and Alaska Nurses' Association</u>, 320 NLRB No. 49 (1996). Moreover, as the Board itself appears to have recognized, the distinction that the Union urges is one properly applied to the interpretation of what it means "responsibly to direct" "employees" rather than to the interpretation of "independent judgment." <u>See</u> <u>id.</u> at 18-19. Yet, in <u>Mississippi Power</u> the Board specifically recognized that the employees at issue did assign and direct field employees, focusing instead on the question of "independent judgment." <u>Id.</u> at 11 ("The evidence shows that the distribution dispatchers and the system dispatchers direct field employees....The evidence, however, fails to show that the dispatchers' assignment and direction require the use of supervisory 'independent judgment.'") The finding that they did not do so was not a factual finding that such direction was merely routine or clerical. <u>See</u> <u>id.</u> at 7 ( "although there are factual differences between this case and <u>Big Rivers</u>,...we find that the differences are legally insignificant.") Rather the finding was by necessity based on the very categorical distinction struck down by the Supreme Court. Indeed, even in its brief to this court, the Board reiterated this distinction by arguing, "if the normal

-15-

standards of a profession or craft govern a workplace, an experienced or skilled employee who articulates what action professional norms require does not make management policy or exercise independent judgment in the statutory sense." Brief for Respondent 12.

Admittedly, the language of Mississippi Power is at times less clear than we might hope. When the Board announces that "even critical judgment by employees based on their experience, expertise, know-how or formal training and education does not, without more, constitute the exercise of supervisory judgment," Mississippi Power at 8, its use of "without more" merely begs the question and its frequent use of the conclusory phrase "supervisory judgment" does not help matters. This ambiguity may reflect the running battle that the Board has conducted over the years to indirectly limit the impact of Congress' inclusion of the phrase "responsibly to direct" in Section 2(11) through overly narrow interpretations of other parts of the statutory text.[5] In any event, our

---

[5]Before 1983, the NLRB consistently held that electrical utility workers similar to those at issue in this case were not statutory supervisors either because they did not responsibly direct coworkers, did not employ independent judgment or both. Courts of appeals refused to enforce these decisions on either ground, concluding that the workers were statutory supervisors. See Arizona Public Serv. Co. v. NLRB, 433 F.2d 228, 232 (9th Cir. 1971), NLRB v. Detroit Edison Co., 537 F.2d 239, 243 (6th Cir. 1976), Southern Ind. Gas and Elec. Co. v. NLRB, 657 F.2d 878, 886 (7th Cir. 1981), Monongahela Power Co., 657 F.2d 608 (4th Cir. 1981). Eventually, the Board bowed to the body of caselaw in Big Rivers. 266 NLRB 389. Subsequently however, the Board attempted another collateral attack applying a narrow interpretation of the statutory requirement that a supervisor have authority "in the interest of the employer." Northcrest Nursing Home,

reading of <u>Mississippi Power</u> given the context and its references to the charge nurse cases places it within the umbrella of <u>Kentucky Rivers.</u> If the Board wishes to introduce a new standard for interpreting when a person responsibly directs employees, it should do so forthrightly and explicitly so that it may be "required to apply in fact the clearly understood legal standards that it enunciates in principle." <u>Allentown Mack Sales and Service Inc., v NLRB</u> 522 U.S. 359, 376 (1998).

Because we reject the Board's interpretation of "independent judgment" as announced in <u>Mississippi Power</u> and applied in this case, we need not review the Regional Director's factual findings. We may not enforce the Board's order by applying a standard that the Board did not adopt. <u>Kentucky River Community Care,</u> 121 S.Ct. at 1871. Hence the Board's erroneous interpretation of "independent judgment" precludes us from enforcing its order in this case. Accordingly we reverse the Board's entry of summary judgment, vacate its bargaining order directing the Company to negotiate with a Union bargaining unit that includes the transmission employees, and deny enforcement. The Board's

313 NLRB 491 (1993). The Board held that authority was not exercised "in the interest of the employer," when "independent judgment [was] exercised incidental to professional or technical judgment" instead of for "disciplinary or other matters, i.e., in addition to treatment of patients." <u>Id</u> at 505. This approach too was ultimately rejected, this time by the Supreme Court in <u>NLRB v. Health Care & Retirement Corp. of America,</u> 511 US 571 (1994).

-17-

request for remand is also denied.

**ORDER REVERSED, ENFORCEMENT DENIED.**