405 F.3d 1071
 PUBLIC SERVICE COMPANY OF COLORADO, Petitioner-Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent-Cross-Petitioner,
International Brotherhood of Electrical Workers, Local 111, Intervenor.
 No. 03-9609.
 No. 03-9615.
 United States Court of Appeals, Tenth Circuit.
 April 26, 2005.
 
 Kevin W. Hecht (David M. Jaffe, with him on the brief), of White and Steele, P.C., Denver, CO, for Petitioner-Cross-Respondent.
 Kathleen E. Lyon, Attorney (Fred L. Cornnell, Supervisory Attorney, Arthur F. Rosenfeld, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, with her on the brief), National Labor Relations Board, Washington, D.C., for Respondent-Cross-Petitioner.
 Joseph M. Goldhammer (Ellen M. Kelman, with him on the brief), of Brauer, Buescher, Goldhammer, Kelman & Dodge, P.C., Denver, CO, for Intervenor.
 Before BRISCOE, HARTZ, and McCONNELL, Circuit Judges.
 HARTZ, Circuit Judge.
 
 
 1
 This appeal concerns whether three revenue-protection workers of the Public Service Company of Colorado ("PSC") are "supervisors" under § 2(11) of the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. § 152(11). After the International Brotherhood of Electrical Workers, Local 111 ("Union") filed a petition seeking an election to determine whether the three workers desired representation by the Union, a hearing officer of the National Labor Relations Board ("NLRB" or "Board") conducted a hearing, found that the workers were not supervisors or managers, and ordered an election. All three voted for representation and the NLRB certified the Union as their exclusive bargaining representative. PSC, however, refused to bargain with the Union concerning the three workers. The Union filed an unfair-labor-practice charge with the Board, which determined that PSC's refusal was an unfair labor practice under § 8(a)(1) and (5) of the NLRA, 29 U.S.C. § 158(a)(1) and (5).
 
 
 2
 PSC seeks review in this court, contending that it is justified in its refusal to bargain because the three workers are "supervisors" and thus not "employees" entitled to engage in collective bargaining under the NLRA. The NLRB cross-petitions for enforcement of its order to bargain. We have jurisdiction to review and enforce NLRB orders under § 10(e) and (f) of the NLRA, 29 U.S.C. § 160(e) and (f). Because the record adequately supports the NLRB's determination that the three revenue-protection workers do not "hav[e] authority, in the interest of the employer, to ... reward ... other employees, or ... to adjust their grievances[,]" 29 U.S.C. § 152(11), we deny the PSC's petition and grant the Board's cross-petition for enforcement of its order.
 
 I. BACKGROUND
 
 3
 PSC, a wholly owned subsidiary of Xcel Energy, is a public utility providing gas and electric services to residential and commercial customers in Colorado. Since 1946 the Union has represented PSC's Operations, Production and Maintenance (OP & M) collective-bargaining unit. The Union also represents PSC's meter readers in a separate bargaining unit. Each unit is covered by its own collective-bargaining agreement.
 
 
 4
 This dispute centers on the status of three workers: one revenue-protection analyst and two revenue-protection investigators. Each receives an annual salary but earns less than some of the bargaining-unit employees who earn hourly wages. They are supervised by Xcel Energy personnel in Minnesota. The revenue-protection workers respond to revenue losses caused by the use of energy for which PSC has not been paid. They determine the reason for the loss (such as equipment problems or customer theft), estimate the lost energy, and process a bonus for the bargaining-unit employee who first reported the problem.
 
 
 5
 Two collective-bargaining agreements provide bonuses for bargaining-unit employees who first find unauthorized energy diversions. The bonus is equal to 10% of the "final negotiated settlement amount," R. Vol. II, Joint Ex. 2 at 57, or $10.00, whichever is greater. The collective-bargaining agreements cap the bonus at $15,000.00 per revenue loss. If more than one employee is involved in the first finding, the bonus is divided equally.
 
 
 6
 An employee who discovers an apparent energy diversion enters a report into the company's computer system. The employee's identification number (from which one can determine whether the employee belongs to a collective bargaining unit) and the date are included in the report so that the first finder can be correctly identified.
 
 
 7
 The revenue-protection analyst reviews these reports daily. The computer system indicates whether the apparent diversion of electricity was authorized (which may occur when a customer is engaged in new construction or rewiring) and, if not, whether it has been corrected by resetting, repairing, or replacing the meter. If the diversion has been corrected, the analyst reviews the billing records. Sometimes the computer will have already calculated estimates and billed the account accurately. When there has not been a significant revenue loss, the analyst records a $10 bonus for the first finder if that employee is a bargaining-unit member. When the records show a drop in billing indicating a significant revenue loss, the analyst refers the case to the billing department. The billing department determines whether to add charges to the customer, a process called "prorating the account," and then communicates its decision to the analyst, who records a bonus equal to the greater of $10 or 10% of what the billing department additionally charged the customer. The analyst's only discretion in this process is deciding whether the revenue loss is significant enough to refer the account to billing. The employee who reported the loss benefits from the referral only if the billing department ultimately charges the customer more than $100 for the unmetered service.
 
 
 8
 If the meter problem has not been corrected, the analyst assigns the case to one of the two revenue-protection investigators. Upon completion of the investigation the analyst receives a report from the investigator. When the investigator requests that the case be referred for prorating, the analyst forwards the report to the billing department. As in the other referred cases, if the billing department charges the customer for the unmetered power, the analyst is informed of the amount of the bill and enters the appropriate bonus for the first finder. In short, when an apparent problem has not been corrected, the analyst serves only a clerical function.
 
 
 9
 The investigators work both in the field and in the office, analyzing reported cases of revenue loss. To determine whether unmetered usage has actually occurred, an investigator visits the site with a meterman[1], who verifies any theft or equipment malfunction and corrects the problem. The investigator collects and preserves any physical evidence of theft. If the meterman's findings correspond with the report of the first finder and that employee is a bargaining-unit member, the investigator notes the employee's eligibility for a bonus.
 
 
 10
 The investigator then reviews the account's billing history in the same manner as the analyst, and estimates the amount of unmetered power using one of several methods taught by PSC supervisors and at training conferences. The preferred, and most common, method is to measure usage for two to four weeks after a meter is operational and then apply the daily average to the unmetered period. When this future-use method is impracticable, as when a new meter is never installed, the investigators use other methods, including (1) basing the estimate on historical usage; (2) using readings from a similar-sized home or business with the same load; and (3) obtaining amperage readings from the home or business and converting those measurements into daily kilowatt hours. These methods are prioritized by the company.
 
 
 11
 The investigator may also interview witnesses, such as the customer, the customer's electrician, or neighbors. The information obtained may be particularly useful in determining the time period of unmetered usage or in making adjustments to estimated unmetered usage when a customer added new load (say, installing a major appliance) during or after the unmetered period. The customer bears the burden of convincing the investigator that an estimate of unmetered usage is too high. Adjustments apparently are uncommon.
 
 
 12
 At the conclusion of the investigation the investigator delivers to the revenue-protection analyst a report that includes the estimate of unmetered kilowatt hours, recommends whether the billing department should prorate the account, and indicates whether the reporting employee is eligible for a bonus. If proration has been recommended, the analyst forwards the report and her own report to the billing department. Although the billing department is not bound by the recommendations of the analyst or the investigators, it rarely disagrees. As with the accounts referred by the analyst without investigation, the billing department calculates the customer's bill and communicates its decision back to the analyst, who then records the appropriate bonus for a qualifying employee.
 
 
 13
 Occasionally grievances are filed by employees who believe that they were improperly denied a bonus or that the amount of a bonus should have been higher. The revenue-protection investigators and analyst have no authority to grant or deny grievances, but they report to PSC managers how they determined bonus eligibility or how they calculated the unmetered loss. They may be asked to review the matter based on information from the employee, and an adjustment may be made. Perhaps it is more common for adjustments to be made before the employee has filed a grievance, as was the case with the one example of such an adjustment that appears in the record: a bonus based on an estimate by a Texas billing technician was made before the loss calculation by the investigator, who was waiting for new-meter readings, so the bonus was recomputed after those readings.
 
 
 14
 On December 18, 2002, the Union sought an election under § 9(c) of the NLRA, 29 U.S.C. § 159(c), to determine whether the three revenue-protection workers desired representation as part of the OP & M unit. PSC argued that these workers are either supervisors, within the meaning of § 2(11) of the NLRA, or managerial employees, and therefore ineligible for representation. After an evidentiary hearing the Regional Director concluded that the revenue-protection workers are neither supervisors nor managers and directed that an election be held. PSC filed a request for review of the Regional Director's ruling, which the NLRB denied. The Board conducted an election, and all three revenue-protection workers voted for the Union to represent them. On June 24, 2003, the Board certified the Union as the exclusive bargaining representative of the revenue-protection workers as part of an existing OP & M unit.
 
 
 15
 An employer cannot obtain direct judicial review of such a certification. Pub. Serv. Co. of Colo. v. NLRB, 271 F.3d 1213, 1217 (10th Cir.2001) ("[D]irect judicial review of [NLRB] representation determinations is unavailable."). But the employer is not without recourse. It can refuse to bargain, thereby inducing the union to file an unfair-labor-practice charge. See id. at 1217. That is what happened here. In response to the charge, PSC admitted its refusal to bargain, but attacked the validity of the Union's certification as the revenue-protection workers' bargaining representative, contending that the three workers are not covered by the NLRA. On October 29, 2003, the Board granted summary judgment against PSC and ordered it to bargain with the Union, noting that PSC had failed to offer "any newly discovered and previously unavailable evidence," or to "allege any special circumstances that would require the Board to reexamine the decision made in the representation proceeding." Pub. Serv. Co. of Colo., 340 N.L.R.B. No. 109 (Oct. 29, 2003). In response PSC petitioned this court for review of the Board's order and the underlying determination that the revenue-protection workers are not supervisors. (PSC has not pursued its contention that they are managers.) The Board cross-petitioned for enforcement of its order in the unfair-labor-practice proceeding. The Union intervened in support of the Board.
 
 II. DISCUSSION
 
 16
 A "supervisor" is not an "employee" entitled to protection under the NLRA. NLRA § 2(3); 29 U.S.C. § 152(3) (excluding "supervisors" from definition of employee). Section 2(11) of the NLRA defines a supervisor as follows:
 
 
 17
 The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.
 
 
 18
 29 U.S.C. § 152(11). Because the requisite types of power are set forth disjunctively, "the existence of any one of the listed powers, as long as it involves the use of independent judgment, is sufficient to support a determination of supervisory status." Meredith Corp. v. NLRB, 679 F.2d 1332, 1335 (10th Cir.1982).
 
 
 19
 In NLRB v. Kentucky River Community Care, Inc., 532 U.S. 706, 121 S.Ct. 1861, 149 L.Ed.2d 939 (2001), the Supreme Court articulated a three-part test for supervisory status:
 
 
 20
 Employees are statutory supervisors if (1) they hold the authority to engage in any 1 of the 12 listed supervisory functions, (2) their exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment, and (3) their authority is held in the interest of the employer.
 
 
 21
 Id. at 713, 121 S.Ct. 1861 (internal quotation marks omitted). The Court further observed that "[m]any nominally supervisory functions may be performed without the exercis[e of] such a degree of ... judgment or discretion ... as would warrant a finding of supervisory status under the Act." Id. at 713, 121 S.Ct. 1861 (internal quotation marks omitted) (alteration in original).
 
 
 22
 The burden of proving supervisory status falls on the party asserting it. Ky. River Cmty. Care, Inc., 532 U.S. at 711-12, 121 S.Ct. 1861. PSC offers four arguments why the revenue-protection workers are supervisors: (1) they reward or effectively recommend rewarding other employees; (2) they adjust or effectively recommend adjusting other employees' grievances; (3) if they are not deemed supervisors, their status as bargaining-unit employees will violate the NLRA's goal of protecting against "divided loyalties"; and (4) secondary indicia show that revenue-protection workers have supervisory status.
 
 
 23
 Our examination of these arguments is restricted by the narrow scope of our review. "The Board's factual findings must be upheld if they are supported by substantial evidence on the record considered as a whole." Pub. Serv. Co. of Colorado, 271 F.3d at 1218 (internal quotation marks omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Accordingly, if supported by substantial evidence, we must affirm the Board's conclusions even though we might reach a different result were we reviewing the record de novo." Four B Corp. v. NLRB, 163 F.3d 1177, 1182 (10th Cir.1998) (internal quotation marks and citations omitted).
 
 
 24
 "We review the Board's legal judgments to determine whether the Board correctly interpreted and applied the law." Id. (internal quotation marks omitted). In reviewing the Board's interpretation and application of the NLRA, however, "we must accord its interpretation some deference: [f]or the Board to prevail, it need not show that its construction is the best way to read the statute; rather, courts must respect the Board's judgment so long as its reading is a reasonable one." Id. (internal quotation marks omitted).
 
 
 25
 We now address PSC's contentions.
 
 A. Authority to Reward
 
 26
 The revenue-protection workers are supervisors if they exercise independent judgment to reward or effectively recommend rewarding other employees in the interest of PSC. To determine whether they satisfy this test, it is first necessary to review the extent of their exercise of independent judgment in the bonus process.
 
 
 27
 The record reflects that the revenue-protection analyst exercises virtually no independent judgment. To determine whether a reporting employee is eligible for a bonus, she uses strict criteria: (1) does the employee belong to one of the bargaining units whose members are eligible for a bonus and (2) was the diversion of power authorized? She does not compute the amount of the loss and merely applies a mathematical formula to compute the amount of the bonus. Her only discretion is in deciding whether the apparent loss is large enough to forward to the billing department for prorating. Forwarding the matter can never reduce a bonus (without forwarding, the employee receives the minimum bonus of $10), and it can help the employee only if the billing department ultimately charges the customer more than $100 for the diversion of power. The record amply supports the Regional Director's decision that the analyst does not exercise independent judgment to reward other employees.
 
 
 28
 The revenue-protection investigators exercise greater, but still limited, discretion. The meterman, not the investigator, determines whether there has been a diversion. And the only bonus-eligibility criteria the investigators examine are (1) whether the reporting employee belongs to one of the two collective-bargaining units whose members are eligible for bonuses, and (2) whether the cause of the diversion found by the meterman is the cause reported by the employee. The record suggests that the investigators may have authority to relieve the reporting employee from the clerical error of checking the wrong box for the reported cause of the diversion; but it is unclear whether such an error has ever occurred. Otherwise there appears to be no discretion regarding eligibility.
 
 
 29
 The calculation of unmetered use is not so mechanical a task, but the record supports the Board's view that the investigator's discretion is rather limited. According to the investigators' testimony, objective criteria determine which method to use in calculating the amount of unmetered use, with the future-use method employed whenever practicable. Their testimony and supporting documents also suggest that the application of each method is a matter of applying standard formulae to reported data. The principal exercise of judgment by the investigators, as they describe their duties, appears to be the determination whether the customer has satisfactorily proved that the calculation of unmetered use is incorrect because, for example, the customer added or subtracted equipment (such as a refrigerator) that consumes significant amounts of electricity. The testimony indicates, however, that this determination is based largely on objective evidence and is an uncommon occurrence.
 
 
 30
 The limitations on the investigators' discretion are a crucial consideration. As the Supreme Court stated:
 
 
 31
 Many nominally supervisory functions may be performed without the exercis[e of] such a degree of ... judgment or discretion... as would warrant a finding of supervisory status under the Act. It falls clearly within the Board's discretion to determine, within reason, what scope of discretion qualifies.... [I]t is also undoubtedly true that the degree of judgment that might ordinarily be required to conduct a particular task may be reduced below the statutory threshold by detailed orders and regulations issued by the employer.
 
 
 32
 Ky. River Cmty. Care, Inc., 532 U.S. at 713-14, 121 S.Ct. 1861 (internal quotation marks and citation omitted) (alteration in original). See NLRB v. Meenan Oil Co., 139 F.3d 311, 321 (2d Cir.1998) (dispatchers were not supervisors because they made assignments according to "detailed procedures established by management").
 
 
 33
 A second important consideration is the principal purpose of the investigators' estimate of unmetered usage. That purpose is to enable PSC to collect from customers the value of electricity or gas they have consumed without paying. The workers who receive bonuses are only the indirect beneficiaries of the process. Although the actions of the revenue-protection staff affect the bonuses received by Union members, their job is not to evaluate or improve the performance of fellow employees, any more than it is the job of the batter in a major league baseball game to provide souvenir baseballs for fans who retrieve foul balls or home runs.
 
 
 34
 On this point the Regional Director relied on Brown & Sharpe Mfg. Co., 87 N.L.R.B. 1031, 1949 WL 8285 (1949), enforced, 183 F.2d 259 (1st Cir.1950). In that case the collective-bargaining agreement provided for an incentive wage plan under which time studies set a standard rate for any particular operation. See NLRB v. Brown & Sharpe Mfg. Co., 169 F.2d 331, 332 (1st Cir.1948). Employees were guaranteed a minimum hourly pay, but by increasing their piecework rate beyond the standard rate, they could earn more. Id. The issue was whether time-study personnel were supervisors. The appellate court described their work as follows:
 
 
 35
 The function of determining the time standards for each operation is the primary responsibility of the time-study men. By means of a stop watch and the application of specialized knowledge and experience gained both at the plant and at technical schools, the time-study men time each operation and initially fix the time standard for the job. The time study is not a mere routine operation but requires the use of judgment, particularly in respect of the making of corrective allowances.
 
 
 36
 Id. (internal quotation marks omitted). The Board found that although the functions of time-study personnel "may have an effect upon the earnings and employment conditions of `other employees,' such effect is entirely incidental, and clearly does not stem from the exercise by them of a bona fide supervisory power to `reward' within the intendment of the amended Act." Brown & Sharpe Mfg. Co., 87 N.L.R.B. at 1036. The assignment of bonuses here is even more incidental to the task of calculating unmetered usage than the relationship between production workers' incentive pay and time studies because the principal purpose of time studies was to set worker pay, whereas the principal purpose for calculating unmetered usage is to collect from customers, a matter totally divorced from employee compensation.
 
 
 37
 PSC counters with three cases in which the Board found workers to be supervisors because they effectively recommended rewards. In Bayou Manor Health Center, Inc., 311 N.L.R.B. 955, 1993 WL 191457 (1993), the nurses deemed to be supervisors annually evaluated certified nursing assistants (CNAs) on 16 criteria. Id. The CNA's scores directly determined the merit increase the CNA received. Id. In Pine Manor Nursing Center, 270 N.L.R.B. 1008, 1009, 1984 WL 36473 (1984), the charge nurses evaluated probationary aides and orderlies and recommended their retention or dismissal. They also awarded "stars" in their discretion; for every ten stars accumulated, the aide or orderly received a ten-cent increase per hour. Id. In Wal-Mart Stores, Inc., 335 N.L.R.B. 1310, 2001 WL 1149041 (2001), the employee in question was similarly involved in the evaluation of other employees and the evaluation determined the amount, if any, of the employee's pay increase. 335 N.L.R.B. at 1315-16.
 
 
 38
 All three cases are readily distinguishable. Even ignoring whether the supervisor's task in each of these cases required more independent judgment than that exercised by the revenue-protection workers here, the relationship between the supervisor's judgment and the worker's reward was hardly incidental. The purpose of the evaluations was to influence the performance of the evaluated employees.
 
 
 39
 The Board appears to have been consistent in interpreting the phrase "reward ... other employees" in the definition of supervisor, 29 U.S.C. § 152(11), as not including actions that only incidentally benefit other workers. This interpretation is a reasonable construction of ambiguous language — when one thinks of a supervisor rewarding an employee, one generally thinks of the supervisor as doing so with the purpose of influencing the employee's job performance — and therefore is entitled to deference. Four B Corp., 163 F.3d at 1182. Under that interpretation, and in light of the record evidence indicating that revenue-protection workers exercise little independent judgment in the bonus process, we must affirm the Board's rejection of PSC's contention that the three workers are supervisors because they "reward ... other employees ... or effectively ... recommend such action."
 
 B. Authority to Adjust Grievances
 
 40
 PSC also contends that the revenue-protection workers are supervisors because they exercise independent judgment to "adjust ... grievances, or effectively to recommend such action." 29 U.S.C. § 152(11). The Regional Director, however, concluded that the revenue-protection workers' role in the grievance procedure is limited to communicating to management the basis of a bonus decision. Testimony at the hearing before the hearing officer established that the revenue-protection workers have no authority to grant, deny, or compromise grievances, and that they had never participated in a grievance meeting. It is not enough that a grievance challenging a bonus may effectively be decided by reliance on the revenue-protection worker's calculation of unmetered usage. As with the time-study workers in Brown & Sharpe, the revenue-protection workers do "not participate in negotiations leading to settlement of the dispute." 169 F.2d at 332. And providing expert testimony for a grievance proceeding does not constitute adjustment of a grievance under 29 U.S.C. § 152(11). See id. at 334. Perhaps revenue-protection workers occasionally respond to informal complaints from workers seeking bonuses. But "[t]here is a qualitative difference between adjustment of `grievances' and corrections of mere mistakes when an employee calls attention to them." NLRB v. Sheet Metal Workers Int'l Ass'n, Local 104, 64 F.3d 465, 469 (9th Cir.1995) (correcting travel pay). The record supports the Board's rejection of the contention that the revenue-protection workers were supervisors on the ground that they adjusted, or effectively recommended adjusting, grievances.
 
 C. Divided Loyalties
 
 41
 Next, PSC contends that the conclusion that the revenue-protection workers are not supervisors frustrates one of the NLRA's goals, that of protecting against divided loyalties. The Supreme Court has stated that both the supervisor and manager exceptions to the NLRA grow out of the concern "[t]hat an employer is entitled to the undivided loyalty of its representatives." NLRB v. Yeshiva Univ., 444 U.S. 672, 682, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980).
 
 
 42
 Whether or not the statutory definition of supervisor "permits consideration of the potential for divided loyalties," NLRB v. Health Care & Ret. Corp. of Am., 511 U.S. 571, 580, 114 S.Ct. 1778, 128 L.Ed.2d 586 (1994), the record does not indicate a substantial risk of divided loyalties here. Of particular importance is that the structure of the bonus program unites the interests of PSC and its workers. A worker receives a bonus only when the worker reports an income loss to PSC that requires correction. The bonus is tied to the extent of the loss. The larger the amount of the loss calculated by the revenue-protection worker, the larger the bonus to a fellow worker and the larger the amount PSC will bill the customer. The only way in which a revenue-protection worker's efforts to increase the bonuses of fellow workers might injure PSC is if those efforts result in overcharges to customers that lead to customer-relations problems. Such abuse by a revenue-protection worker would, however, be transparent, because the offended customer would complain to the billing department, and corrective measures (both to reduce the charge and to discipline the worker) could readily be taken. This risk may not be nonexistent, but the Board could properly decide that the risk is too small to require that revenue-protection workers be treated as supervisors.
 
 
 43
 We note that PSC contends that the Union constitution creates a conflict of loyalty because a member can be disciplined for "[w]ronging a member of the [Union] by any act ... causing him ... economic harm." R. Vol. I at 300. PSC suggests that a revenue-protection worker could therefore be required by the Union to comply with every request for an increased bonus or face Union sanctions. At the hearing, however, PSC took no steps to inquire into the meaning of the constitutional provision. We are unwilling to reverse the Board on speculation that the Union constitution requires workers to breach their work responsibilities.
 
 
 44
 Likewise, we reject PSC's contention that a conflict of loyalty arises from the alleged authority of revenue-protection investigators to compromise a customer's bill to accommodate the customer's financial condition. Both investigators denied that they had this authority, and the contrary evidence was ambiguous at best. The Regional Director's findings include no mention of such authority. And even PSC's witness estimated that investigators adjust bills (on some basis or other) only half a dozen times a year. Any potential conflict of loyalty here is too slim a reed to support reversal of the Board's decision.
 
 D. Secondary Indicia
 
 45
 Finally, PSC argues that the status of the revenue-protection workers as supervisors is shown by secondary indicia — indicia not included in the statutory definition of supervisor but that often accompany the status of supervisor. The company points to the revenue-protection workers being salaried employees and being supervised by Xcel energy officials located in Minnesota. Secondary indicia, however, are of marginal importance in resolving whether a worker is a supervisor. In NLRB v. Dole Fresh Vegetables, Inc., 334 F.3d 478 (6th Cir.2003), the Sixth Circuit recently observed:
 
 
 46
 Although we have not previously determined the weight to be afforded secondary indicia of supervisory status, other Circuits have held that secondary indicia should be relied upon in limited circumstances. See, e.g., N. Mont. Health Care Ctr. v. NLRB, 178 F.3d 1089, 1096 n. 6 (9th Cir.1999) ("The `secondary indicia' of supervisory authority are only relevant `[i]n borderline cases.'") (quoting NLRB v. Chicago Metallic Corp., 794 F.2d 527, 531 (9th Cir.1986)); NLRB v. Attleboro Assocs., Ltd., 176 F.3d 154, 163 n. 5 (3d Cir.1999) (explaining that the Third Circuit relies on the statutory text and not secondary indicia in determining statutory status); E & L Transport Co. v. NLRB, 85 F.3d 1258, 1270 (7th Cir.1996) ("Although not determinative on their own, where one of the enumerated indicia in § 152(11) is present, secondary indicia support a finding of statutory supervisor."). But see Entergy Gulf States, Inc. v. NLRB, 253 F.3d 203, 209 (5th Cir.2001) ("[S]econdary indicia of supervisory authority may be pertinent...."). Moreover, the Board has held consistently that secondary indicia of supervisory status are not dispositive without evidence of at least one primary indicator of supervisory status. See, e.g., Billows Elec. Supply of Northfield, Inc., 311 NLRB 878 n. 2, 1993 WL 191462 (1993); Juniper Indus., Inc., 311 NLRB 109, 110, 1993 WL 176135 (1993).
 
 
 47
 Id. at 487-88. Regardless of whether we might find secondary indicia persuasive in a proper case, the indicia here are too unremarkable to affect the result.
 
 III. CONCLUSION
 
 48
 Because we uphold the Board's determination that the three revenue-protection workers are not statutory supervisors and its ruling that PSC committed an unfair-labor practice, we DENY PSC's petition for review and GRANT enforcement of the Board's order.
 
 
 
 Notes:
 
 
 [1]
 The termmeterman is defined by the OP & M collective-bargaining agreement and is the term used in the briefs of all parties.